## PHILIP M. HILLWOOD *v.* KATHERINE R. HILLWOOD.

### [No. 6, April Term, 1930.]

*Decided May 15th, 1930.*

The cause was argued before BOND, C. J., URNER, OFFUTT, DIGGES, PARKE and SLOAN, JJ.

*Harry W. Nice,* with whom were *Paul A. Sullivan, Malcolm J. Coan,* and *Edwin T. Dickerson,* on the brief, for the appellant.

*Murray MacNabb,* for the appellee.

PARKE, J., delivered the opinion of the Court.

The plaintiff, Katherine R. Hillwood, was a widow with a daughter, when she was married to Philip M. Hillwood, defendant, on June 24th, 1921. No children were born of this union, and on March 6th, 1929, the plaintiff began a suit to obtain a divorce *a mensa et thoro* from the defendant with alimony, and to have certain conveyances to the husband of her property annulled, and an accounting had from him of all rents and profits received from the property so

conveyed and of all moneys of the plaintiff which had come in any way into the hands of the defendant. The grounds alleged for the divorce were cruel and vicious conduct, and the conveyances were assailed for fraud and coercion. The parties took testimony before an examiner, and the chancellor passed a decree granting the wife a partial divorce and annulling the conveyances attacked, and awarding the wife an accounting and restitution of all her property which the husband is charged with having taken into his possession.

The plaintiff, who is fifty-seven years old, left the home of her husband during the first week of January, 1929. She supported her charge of cruelty by her testimony that her husband has struck her in the face on two occasions. The first was in the fall of 1921, and the second time was a year later. This testimony is denied by the husband and is not corroborated, but, if true, the acts were not followed by a cessation of the marital relation, which continued too long after their occurrence not to have been condoned. The wife further testified that, with the spring of 1922, the defendant began to threaten to kill her, but there is nothing in her testimony that tends to establish the threats created any real apprehension of physical danger, or were accompanied or followed by personal violence, until the spring of 1928, when she swears that her husband put poison in her food. The other serious accusation in justification of her leaving her husband is that her health had been impaired by his maltreatment.

Taking up these questions in their inverse order, but without indulging in a statement and discussion of the testimony on the record, the alleged misconduct of the husband that affected the wife's health was a course of angry words and abusive language and unjustified complaints.

Marriage imposes upon husband and wife the duty to bear and forbear. Marital neglect, indifference, sallies of passion, harshness and the use of vulgar and abusive language and occasional acts of violence of no serious nature have been repeatedly declared insufficient to justify an abandonment. *Hastings v. Hastings,* 147 Md. 182; *Polley v. Polley,* 128

Md. 66. The testimony of the wife as to the husband's language is general and indefinite, is uncorroborated, and is denied by the defendant, and so cannot be held sufficiently proved within the requirements of law. Nor is there any corroboration of her statement that her mental and physical condition when she left her home was caused by her husband's alleged conduct. She did not consult a physician until October 26th, 1928, when, upon the advice of her solicitor and as preparatory to her proceedings for a divorce, she saw one to see if she had not been poisoned. The doctor testified that, although in a nervous condition, the plaintiff seemed, physically and organically, to be in good health at the time of her two visits to his office. Neither this nor the evidence of her activity in interviewing prospective witnesses is consistent with the plaintiff's testimony that she was so sick and nervous when she left home that she could hardly stand on her feet. So, the whole testimony leaves the court unconvinced that the husband's demeanor and language had impaired the health of the plaintiff.

If, as the plaintiff testified, the defendant had put poison in the food of the plaintiff, this act would have been cruelty within the meaning of the law. 1 *Bishop on Marriage and Divorce* (2nd Ed.), sec. 1557. The plaintiff bases her accusation on the fact that during and after the spring of 1928 she would become sick subsequent to eating. She further stated that food, which was left after a meal and put away, when fed to the dog, would affect the dog so that in two weeks he could barely stand on his feet, and that she saw the white crystals glittering on her plate and individual dishes and drinking cup. She swore that the poison was bitter, but was tasteless until it started down the throat, and that her mouth, tongue, and lips were sore all the time he was making her violently ill by administering the poison. Although the conditions and symptoms continued until her complexion became as dark as a mulatto and she could hardly walk by reason of her weakness, the plaintiff made no complaint to her husband, but continued to live with him and exposed herself to the perils of a poisoner's art without consulting a doctor

or setting on foot an investigation until October 26th, 1928, when she went to see a doctor at the suggestion of her solicitor, whom she had employed to obtain a divorce.

A week after this first visit she paid a second and final one, and brought with her food to be examined, because she said her husband had put in it some poison which she thought was silver salt. Although not a chemist, the doctor did not send her or the food to an expert, but put a portion of the food in a tube and tested it but found no poison. She complained to the doctor that her skin was dark because of a poison which she said her husband had been putting in her food, but the doctor's evidence is that this darkening of the complexion could have been produced by a number of natural causes, and he could not say it was attributable to poisoning. This evidence did not support the plaintiff's theory, but tended to refute her charge that her husband had poisoned the food.

The plaintiff did the cooking and prepared the meals for the table and had charge of the household affairs. Although she never saw her husband put anything in the food, she is willing to swear that on one occasion in her presence and in that of a neighbor he put something in a dish which made her sick and vomit after she had eaten the food. The neighbor testified to the plaintiff's sickness, but did not say she had seen the defendant put anything in the dish. This episode affords no justifiable inference of guilt. The deduction of the wife is incredible. Even the hardiest and skilfullest poisoner will not be assumed to have sprinkled his poison in the presence of his victim and her friend.

The husband testified to his complete innocence, and the wife stands alone with no material corroboration. Furthermore, her testimony is conflicting and contradicted in material matters by disinterested witnesses. Her testimony, also, disclosed an animus against the defendant and a desperate determination to secure the return of her property and a divorce from her husband which gravely affect the weight of any statement by her which would make for the success of her objectives. How far she will go to secure favorable testi-

mony in her litigation is disclosed by her own admission of offers of money to prospective witnesses, and to persons who were not engaged in detective work, if they would secure evidence of infidelity on the part of her husband. She denies that she had any other motive than securing evidence of actual facts, but it was manifestly an improper method to offer a liberal compensation to a party if he could testify to the adulterous conduct of a spouse. Indeed, one of the women approached testified that, at a time when the plaintiff's testimony represented herself as being broken in mental and physical health, the plaintiff was actively engaged in the investigation of her husband's life and in that pursuit visited the witness and offered her $100 if she would testify that her husband had commerce with a married colored woman. Even if the plaintiff's version of her conduct in attempting to secure incriminating evidence be accepted, her acts remain reprehensible, and expose her to condemnation and lessen the weight of her testimony. A careful review of the evidence in the light of the circumstances compels a finding that the plaintiff has failed to establish her right to a divorce.

2. Although the jurisdiction to award a wife such property or estate as she had when married does not arise under section 39 of article 16 of the Code when a divorce is not decreed, yet a court of equity has jurisdiction under its general powers to annul conveyances and to enforce restitution of property which have been obtained by the husband from the wife by fraud, undue influence or coercion, and the bill of complaint in this cause is framed upon that theory. *Reed v. Reed,* 109 Md. 690, 692. The law on this subject is familiar. It is that a wife may dispose of her property by gift to her husband as fully and effectually as if the transaction were between persons not occupying that relation, but, because of the natural dominance of the husband and the trust and confidence commonly incident to their union, the gift will be closely, carefully, and vigorously investigated in a court of equity, and be annulled if obtained by fraud, coercion, misrepresentation, or undue influence. *Tyson v. Tyson,*

54 Md. 35, 38-40; *Livingston v. Hall,* 73 Md. 386; *Reed v. Reed,* 109 Md. 690.

At the time of the marriage of the plaintiff and defendant, the latter was practically without property, but the wife was the owner of a farm of 50.89 acres and another one of about 100 acres; and two improved lots on Gay Street in Baltimore City. She still retains title to the larger farm, but four years after their marriage the smaller farm was conveyed to an attorney in order that he might reconvey this farm to the husband and wife as tenants by the entireties, which was done on September 10th, 1925, and the two deeds required for the transfer put upon record on the following day. In January, 1925, the wife sold and she and her husband conveyed the two Gay Street lots; and in May and September, 1928, the husband and wife granted a portion of the smaller farm to the Baltimore and Ohio Railroad Company; and the proceeds of all these transactions were divided. It was not until March 6th, 1929, that the wife filed her bill of complaint to set aside the deeds creating the estate by the entireties and to have restored to her the money received by the husband by way of division and as rents and revenue. The delay does not commend the pending proceedings, but if the burden be imposed upon the husband of affirmatively showing that the deed creating the tenancy by the entireties and the receipt of moneys were severally untaintd by fraud, misrepresentation, or coercion, the record confirms the husband in what he thus acquired.

The plaintiff is shown by her own statements to be an educated, capable, and resolute woman, and able to withstand the wishes and importunities of her husband and to maintain and protect her rights of property. The conversion by her of an estate in severalty in the smaller farm to one of a tenancy by the entireties was done deliberately, after delay and consideration and in the face of legal advice that it would be advisable to retain the property in her own name. The husband asserts that the change in title was due to his wife's recognition of his services in improving the premises, but, if this were not true, as the wife insists, the circumstances of the

grant show it to have been at least the voluntary gift of a wife, who was neither the victim of the fraud, deceit, or misrepresentation of the husband nor an object of his undue influence or coercion. Again, when the wife sold through a real estate agent the two Gay Street houses for $10,000, and settled by taking $5,000 in money and a ground rent of $5,000, the husband demanded and received for his assent to the sale the sum of $2,500, which was paid him. The wife, however, received $7,500, as $2,500 was paid her and she made a gift of the ground rent of $5,000 to her sister. The division, therefore, was on the basis of one-fourth to the husband and three-fourths to the wife, which was not a disproportionate division, when the husband would have been entitled to one-third of the property if he had survived his wife. Code, art. 93, sec. 126; art. 45, sec. 7. In this transaction the sale was by the wife's real estate agent and was carried through under the professional advice of her own attorney.

The other transactions of which the wife complains were with the Baltimore and Ohio Railroad Company, which acquired portions of her smaller farm for $30,480, which, after the deduction of $960.85 on account of taxes in arrear, were paid to the husband in three checks aggregating $14,759.57, and to the wife in two checks amounting to $14,759.58. This division was in strict accord with the respective rights of the husband and wife under the deeds creating the tenancy by the entireties. It was, furthermore, an express ratification, after an interval of one week short of three years, of the deed which the wife now assails. Nor did she act hastily in this matter. In May, 1928, the railway company bought a part of the land held by tenancy in entireties on which stood a building. The company agreed to give $1,500 for the building, and paid this amount in full to the husband in May, 1928, and at the same time made a payment on account of the land bought of $500 to the husband and a like amount to the wife. The husband claimed the right to the $1,500 as the builder of the structure sold, but, in the final settlement for the land in September, 1928, this claim of the husband was disallowed and an equal division of the whole purchase price

made by the wife receiving a check for $14, 259.58 as against the check to the husband of $12,759.57. These facts are irrefutably established by the records of the disinterested buyer, and conclusively demonstrate the falsity of the plaintiff's position. In these affairs with the company the plaintiff was represented throughout by able and alert lawyers, and it is idle for her now to protest what she then irrevocably sanctioned. A gift between spouses voluntarily made and devoid of coercion or undue influence is just as valid and binding as a contract between other persons; and a court of equity will not undertake to set aside a valid and completed gift from a wife to the husband, who cannot be compelled to return the money or property given. For the reasons assigned the decree will be reversed, and the cause remanded in order that the bill of complaint may be dismissed.

*Decree reversed, with costs, and cause remanded for a decree in conformity with this opinion.*