ANNA E. K. TILLINGHAST *v.* J. GEORGE LAMP
ET AL.
[No. 62, October Term, 1934.]

36

*Decided January 16th, 1935.*

The cause was argued before BOND, C. J., URNER, OF-
FUTT, PARKE, and SLOAN, JJ.

*Isaac Lobe Straus* and *J. Paul Schmidt,* for the appel-
lant.

*J. Craig McLanahan* and *William Lentz,* with whom
were *Kenneth C. Proctor* and *France, McLanahan &
Rouzer* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

Anna E. K. Tillinghast is the surviving sister of Anna
Katherine Lamp, who died in Baltimore City on January
25th, 1932. J. George Lamp is the surviving husband
of Mrs. Lamp, and Charles F. W. Tillinghast and Samuel
F. Leroy Tillinghast are sons of Mrs. Tillinghast.

At her death she left a considerable estate, including
both real and personal property, which she disposed of by
a will dated February 19th, 1931, in the following man-
ner: To her husband, J. George Lamp, she left a legacy of
$10,000, a life interest in her home property at Park
Heights Avenue and Clarke Lane, in Baltimore City, and
a stall in the Broadway Market; to her nephew, Charles
F. W. Tillinghast, 200 shares of the preferred stock of the
William Schluderberg-T. J. Kurdle Company; to Samuel
Leroy Tillinghast the net income from 200 shares of the
same stock left in trust until he arrives at the age of
forty, then to him absolutely, and to those two a policy
of life insurance for $10,000 on the life of her husband,
and the remainder of the estate in her home property;

to her sister Anna E. K. Tillinghast, 600 shares of the preferred stock in the Schluderberg-Kurdle Company, her stock in the Equitable Trust Company, her jewelry, and all the rest and residue of her estate. And she appointed J. George Lamp, her husband, executor of the will.

The will was in due course admitted to probate; on February 3rd, 1932, letters testamentary on the estate were granted to J. George Lamp; and on April 7th, 1932, he filed in the Orphans' Court of Baltimore City, where the will had been probated, a renunciation of the provisions for his benefit which it contained, and an election to take in lieu thereof his legal share of the real and personal estate of Anna, his wife.

Mrs. Lamp married J. George Lamp on November 24th, 1921. On November 20th of that year, in contemplation of her approaching marriage, she executed a deed in which she covenanted and agreed to make no claim as wife or widow against his estate. On November 16th, 1921, she deposited to her credit, in a savings account in the Equitable Trust Company of Baltimore City, $20,000, and on December 2nd, 1921, she had on deposit in a checking account at the same bank $10,576.88. On November 30th, 1921, the title of the savings account was changed so as to read: "Anna K. Lamp. In trust for self and J. G. Lamp joint owner subject to the order of either, the balance at death of either to belong to the survivor." On December 2nd, 1921, the balance to her credit in the checking account was transferred to an open or checking account having the same heading.

At the death of Mrs. Lamp, J. George Lamp claimed the balances in these two accounts as his own individual property, and he also claimed full legal rights to her estate as the surviving spouse.

On September 13th, 1933, Anna E. K. Tillinghast filed the bill in this case against him individually and as executor of the will of Anna K. Lamp, and against the Equitable Trust Company, in which she asked the court (1) to assume jurisdiction of the estate and direct its administration; (2) to annul the gifts and transfers of the funds

in the checking and savings accounts, and to declare the same a part of the estate of Anna K. Lamp; (3) to require Lamp to account for any sums withdrawn from said accounts after his wife's death; and (4) to declare the renunciation and election of J. George Lamp null, void, and ineffective. On November 7th, 1933, she amended the bill by adding an additional prayer for relief, in which the court was asked to decree that, contemporaneously with the deed of November 20th, 1931, Lamp had executed a separate deed, also in contemplation of marriage, releasing her estate and property of every kind from any marital rights or interest he might have therein, or, in the alternative, to decree that she was led by the fraud of Lamp to believe that the deed which she signed and which he also signed contained a provision that he would release and relinquish all rights which he had or might have in her estate, that she signed that deed in the mistaken belief that it contained such a provision, that it be reformed by including such a provision in it, and further to decree that Lamp cannot now claim any marital rights in her estate.

The defendants demurred to the bill, and the demurrer being overruled, answered. Evidence was taken, the case was heard, and after those proceedings the court decreed:

"That the entries on said signature cards created a trust in the deposits above named whereby at the death of either the said J. George Lamp or Anna K. Lamp, his wife, their survivor became absolutely entitled to the funds then on deposit to the credit of each of said accounts in the Broadway Branch of the Equitable Trust Company, and that the said J. George Lamp at the death of his said wife, Anna K. Lamp, became entitled to the sums then on deposit in each of such accounts referred to in said cards.

"2. That the said J. George Lamp is entitled to the interest and estate in the real and personal property whereof his wife died seized and possessed, which he took under the law, by virtue of his said renunciation; as a result of which he does not take any interest or estate in said prop-

erties under the last will and testament of the said Anna K. Lamp, deceased.

"3. That this Court take jurisdiction over the further administration of the estate of the said Anna K. Lamp, deceased."

This appeal is from that decree.

The questions which this court is asked to consider are these: (1a) Did J. George Lamp ever execute a deed releasing his marital rights in his wife's estate, or (1b) fraudulently induce her to believe that the deed of November 20th, 1921, which she and he signed, operated to release her estate from any marital rights which he had or might claim, as well as release his estate from any marital rights which she might have or claim? (2) Were the transfers of the funds in her two accounts with the Equitable Trust Company valid and effective? And (3) did his act in taking out letters testamentary under the appointment in his wife's will, and his occupation of property left to him under it, estop him from renouncing the provisions for his benefit therein contained, and electing to take his statutory share as surviving spouse in her estate?

Before coming to the facts of the case, there are certain questions of evidence which must be considered because of their effect upon the issues involved in these questions.

This is an action against an executor as such. Therefore the provisions of Code, art. 35, sec. 3, that in such a case "no party to the cause" shall be allowed to testify to any "transactions had with, or statement made by the testator," are applicable, if the subject-matter of the suit is within the scope of that statute. There can be no doubt that so much of it as relates to the bank deposits is within the scope of the statute (*Farmer v. Farmer*, 137 Md. 72, 111 A. 464; *Martin v. Munroe*, 121 Md. 679, 89 A. 319; *Taylor v. Brown*, 65 Md. 366, 4 A. 888), nor should there be any real doubt that so much of it as relates to the transactions between the decedent and Lamp in reference to releases by each or either of his or her marital rights in the property of the other is also within its prohibition.

The purpose of the statute is to eliminate, so far as possible, frauds upon the estates of deceased persons, which might be effected by the testimony of such interested parties as are actually parties to a cause to enforce a claim against such an estate, because of the ease and security with which such evidence could be fraudulently fabricated, in the absence of any fear of contradiction by the party who is said to have made the statement or to have taken part in the transaction, and whose estate is sought to be bound by the claim. Certainly the opportunity for fraud and the temptation to exercise it would be as great, where, as a result of the transaction, a claimant may gain or lose half of an estate, as it would be in the case of a tradesman suing to recover for goods bargained and sold and delivered to the decedent.

Mrs. Anna E. K. Tillinghast, the plaintiff, was repeatedly called upon and permitted to testify as to statements made by her deceased sister, Anna K. Lamp. Seasonable objections were made to the testimony, but were overruled. The objection was made by the appellees, and, since they won in the trial court, they were not injured by the rulings. Nevertheless, since this court, in appeals from courts of equity, must weigh and consider the evidence as a court of chancery would do, if its admissibility was questioned below, the rulings in respect to it are open for review here, and indeed, under Code, art. 16, sec. 279, it is the duty of this court to review such rulings in so far as the same may be material to a determination of the case.

In the course of the trial, witness after witness was called upon to testify to statements made by Mrs. Lamp to the effect either that J. George Lamp had executed a deed releasing his marital rights in her property, or that such a release was embodied in the deed that she had signed, or that the money which she had on deposit with the Equitable Trust Company was, after it had been transferred to the joint account of her and her husband, her individual property. All of these statements were mere self-serving declarations. No argument in favor of their general ad-

missibility has been suggested to this court, and none has occurred to it. Under our system of jurisprudence, hearsay evidence is excluded as irrelevant and immaterial, self-serving declarations are classified as hearsay evidence, and, in so far as those statements were offered as proof of facts, they were inadmissible. *Jones on Evidence,* 483; *Wigmore on Evidence,* secs. 1738, 1790; *Jackson v. Kniffen,* 2 Johns. (N. Y.) 31. But where the mental condition of the declarant is in issue, and where undue influence is charged, such declarations may become relevant as reflecting upon the mental condition of the declarant, and may be admitted for that purpose only, but, when so admitted, afford no substantive proof of disputed facts. 22 *C. J.,* 278; *Jones on Evidence,* sec. 438. In considering the facts of this case, thereore, all such declarations will be excluded from consideration, except in so far as they relate to any mental condition of the declarant relevant under the issue of undue influence, and will not be accepted as proof of any other fact.

While, in view of what has been said, it becomes unnecessary to deal at any length with objections to the testimony of certain attorneys employed by Mrs. Lamp concerning information which they acquired while acting in that capacity, on the ground that they were confidential communications and therefore privileged (*Jones on Evidence,* 748), it may be said that evidence of statements made by her to her attorneys was inadmissible for the additional reason that they were confidential; that the relationship of attorney and client prevented the witnesses from disclosing them; that the privilege was that of Mrs. Lamp, and not of the attorneys; and that it was not affected by her death. *Id.*

The question first stated is essentially one of fact. Appellant's position in respect to it, as disclosed in the allegations of her bill, is that Mrs. Lamp was led by her husband to believe that, by executing the deed under which she released her marital rights in his property, he also released his marital rights in her property, or that he did contemporaneously execute a separate deed releasing her

property from any claims that he might have therein as her husband.

Before referring particularly to the evidence relating to that issue, it will tend to amplify the discussion of it to state just what that transaction was, as well as what it was not.

The deed was in its form an indenture, in its nature a deed poll. Lamp executed it jointly with his wife, although he granted nothing and released nothing, and there is no apparent reason why he should have signed it, or why it should have been drawn in the form it was. Its terms are clear, simple, and direct, and there is no reason why any one of normal intelligence should have failed to understand its meaning and effect. Under it, Mrs. Lamp parted with no property, right or other thing of value, which she then owned, but she did release rights which would vest in her upon her marriage to Lamp. Inasmuch as those rights were inchoate during her life, since she predeceased Lamp, they never became consummate, so that in fact she lost nothing by the deed. Whether she was induced to execute it through fraud, or undue influence, or by mistake, has now become wholly immaterial, unless it appears that she executed it in the mistaken belief that, by signing it, Lamp also released his marital rights in her estate, and that that belief was based upon false and fraudulent assurances by Lamp that the deed did have that effect. It may be conceded for the question that Lamp stood in a confidential relation to Anna Katherine Schluderberg at that time, and that the deed was induced by his fraud, but, while that would be ground for striking it down, its annulment could not now affect Mrs. Lamp's estate in any way. So that the attempt here is not to strike it down, but to reform it by incorporating in it a covenant which it does not contain, to wit, a covenant and agreement by Lamp to release his marital rights in Mrs. Lamp's estate. It is needless to say that in that attempt the burden is upon the plaintiff, and she is aided by no presumptions of any kind. For, while a confidential relationship may, under appropriate circumstances, cre-

ate a presumption that a fiduciary who has obtained property or valuable rights at the expense of one who confided in him is not entitled to retain them unless he can show by clear and satisfactory evidence that there was no abuse of the confidence reposed in him, and that the transaction was a fair one, there is no presumption that, because one standing in a confidential relation to another could or should have conferred a benefit upon him, in fact, he did so. *Pomeroy's Equity,* sec, 956. While such a relation may be invoked to strike down a transfer, it in itself affords no basis for the creation of one. It is one thing to say you had no right to do the thing you did do; it is quite another to say you should have done something which you did not do.

There is not the slightest legal evidence in the case that Lamp ever signed any paper or agreement in connection with the marital rights of himself or his wife other than the agreement offered in evidence in this case, nor is there any legal evidence that any such paper ever existed. Nor does the evidence support the charge that Lamp induced Mrs. Lamp, then Katie Schluderberg, to sign the deed of November 20th, 1921, by leading her to believe that in executing it he released the marital rights which would accrue to him upon his marriage to her. The only direct evidence on that question is that Mrs. Lamp executed and acknowledged the deed and was given a carbon copy of it. That statement by a disinterested witness was improperly stricken out, but, since it was clearly admissible, it must be accepted as a part of the evidence. After the execution of that paper, it stood unquestioned until the death of Mrs. Lamp, some ten years later, and during that period she knew that Lamp had the usual marital rights in her property, because he was required to join with her in the conveyance of real estate which she owned, and, except for the self-serving declarations attributed to Mrs. Lamp, which, for reasons stated above, should have been stricken out, there was no evidence which could be accepted as even tending to prove that Lamp ever promised, or agreed, or conveyed the impression, that he would release

his interest in Mrs. Lamp's estate, or that she understood or believed that he did so promise or agree.

Passing to the second question, the evidence sufficiently shows that both as a matter of law and fact, at the time the funds were transferred, Lamp stood in a confidential relation to his wife; that she had the most complete and implicit confidence in him; that she subordinated her wishes to his; and that he exercised a very real dominion and control over her. To understand their relations and the extent of that control, some reference to their lives prior to the marriage in 1921 is unavoidable.

Anna Katherine Lamp, better known to her family and intimates in her younger days as Katie Schluderberg, was the daughter of William Schluderberg, a sturdy and respected figure in the business life of Baltimore a generation ago, who, as the result of a successful career in the meat packing business, accumulated a substantial fortune. She lived with her father until her marriage to her first husband, Clayton Emerich, and then lived with him in Baltimore until 1890, when she and her husband moved to Washington, D. C., where Emerich operated a chain of provision stores. He later sold that business, and for a time conducted two hotels in that city, one the B. & O., later known as the Cosmopolitan, the other the Pennsylvania Avenue Hotel. She was divorced from Emerich, apparently about 1900, and in the settlement made in connection with that divorce she received the B. & O. Hotel, which she conducted as the Cosmopolitan Hotel until 1905, when she returned to Baltimore to live at her father's home, and later she lived for a time with her sister, Anna E. K. Tillinghast. On June 25th, 1907, she married J. George Lamp, who was also in the meat business. After the marriage, Mr. and Mrs. Lamp boarded at the Denmore Hotel, and then moved to a new house which Lamp owned, on Clark's Lane, and there they lived until March, 1908. In April of that year Lamp filed a bill for divorce *a vinculo matrimonii* against his wife on the ground of premarital unchastity unknown to him at the time of the marriage. In his testimony in the divorce case, Lamp

said that, shortly after the marriage, while they were boarding at the Denmore Hotel, he found his wife "under the influence of liquor," that he then discovered that she drank habitually, and that as a result of that discovery he suspected that she was guilty of other offenses, and had "an investigation made." During the investigation, and while he was still cohabiting with her, she returned from a trip to Washington, and told him that she had learned that he was trying to secure evidence to divorce her. He then told her that he would not stay in the room with her any longer, and she then said: " 'What are you going to do?' and I said, 'I'm going to get out of this room, I am not going to stay in this room with you another night'; she said, 'You shall not go and can't go,' and by that she took the key out of the door and tried to hold me down on the chest we had in the room that I was sitting on, to keep me from going out of the room, and I pushed her aside, and told her if she did not put the key in the door I would break the door down and get out, and she would not do it and then I started to break the door open when she put the key in and let me out, and that night I slept on the third floor, and the following night I slept on the third floor, until I got all my things out and then I left her." In her answer, Mrs. Lamp neither admitted nor denied the charges of misconduct, and in due course a decree was passed divorcing Lamp from his wife.

Notwithstanding the divorce and the supposed indignation and resentment which had prompted him to institute the divorce proceedings and to publish the most damaging and humiliating charges against her character, after the decree he continued to pay attention to his former wife, until June 25th, 1921, when they were remarried and went to live in the home which she had inherited from her father, who had died on April 5th, 1921. It may be inferred from the record that William Schluderberg, the father, who had learned of the details of the divorce proceedings, had little tolerance for Lamp, and both Lamp and Katie Schluderberg apparently believed that Lamp's

attentions would be unwelcome to him, so that, while Lamp and his former wife met from time to time, and he frequently called her over the telephone, and visited her at her home, there was always an atmosphere of secrecy and concealment about their relations until the father's death. His visits to her home were always made after her parents had retired for the night, and there is nothing to indicate that Mr. Schluderberg knew of them.

After their remarriage they lived in her home until her death, and, except for provisions which he furnished from his store, at her expense. During that period she gave every evidence of a devoted attachment to him, and their relations appear to have been pleasant and affectionate. She had an implicit and apparently unshakable confidence in his integrity, relied upon him for advice and guidance, and feared to do or say anything which she thought might give him the impression that she did not trust him.

It is undisputed that the funds deposited to Mrs. Lamp's checking and savings accounts with the Equitable Trust Company were a part of her own sole and separate estate, nor is it disputed that they were transferred from such accounts to joint accounts in trust for herself and her husband, and that her husband at least aided, if he did not direct, that transfer. With that background, under the conventional doctrine of confidential relations, the burden would have been upon the husband to show that the gift was with the free consent of the donor, that the transaction was fair, that there had been no abuse of the confidence, and that the gift was the "pure, voluntary and well understood act of the other" *(Beach, Eq. Jur.,* 141, *Pomeroy, Eq. Jur.,* sec. 956), for "while equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance

with equitable requisites, and of thereby overcoming the presumption." *Pomeroy, Eq. Jur.,* sec. 956, p. 2039. But appellee contends that in this state the law is that that doctrine does not apply to transactions such as those involved here between husband and wife, and cites, in support of that contention, *Hillwood v. Hillwood,* 159 Md. 167, 172, 175, 150 A. 286, 288; *Brell v. Brell,* 143 Md. 443, 449, 450, 122 A. 635; *Lewis v. Lewis,* 140 Md. 524, 527, 118 A. 65; *Reed v. Reed,* 109 Md. 690, 692, 693, 72 A. 414; *Taylor v. Brown,* 65 Md. 366, 372, 373, 4 A. 888. An examination of those cases shows that while they do not deal with the question of the burden of proof, or with confidential relations by name, nevertheless they leave an implication contrary to the weight of authority elsewhere, that the marital status is not in itself sufficient to establish a confidential relationship. But in the latest expression of this court, the rule recognized in this state, relating to transfers of property from a wife to her husband, is as stated in *Hillwood v. Hillwood, supra,* that: "The law on this subject is familiar. It is that a wife may dispose of her property by gift to her husband as fully and effectually as if the transaction were between persons not occupying that relation, but, because of the natural dominance of the husband and the trust and confidence commonly incident to their union, the gift will be closely, carefully, and vigorously investigated in a court of equity, and be annulled if obtained by fraud, coercion, misrepresentation, or undue influence. *Tyson v. Tyson,* 54 Md. 35, 38-40; *Livingston v. Hall,* 73 Md. 386, 21 A. 49; *Reed v. Reed,* 109 Md. 690, 72 A. 414."

For twenty-four years Lamp exercised an extraordinary influence over his wife, which can only be explained upon the theory that throughout she was devotedly attached to him. It would be as idle to speculate upon the reasons for that devotion as it would be to analyze the transient interest of Titania in the unlovely Bottom, but it was a real and a tangible thing. Notwithstanding that he had in the divorce proceeding blackened her character by the most damaging and injurious charges which could

be made against a woman, she, nevertheless, after the divorce, tolerated his advances, and finally remarried him, released all interests which she might have in his estate, and showered him with costly gifts, although throughout that relationship there is no evidence that he did anything in her interest. In small things as well as great she deferred to his wishes, she was apparently afraid to do with her own as she would, and concealed from him gratuities to her own relatives, lest he disapprove. On the other hand, the impression left by the record is that, in his relation to her, Lamp was selfish, cautious, and commercial; that he took all and gave nothing; that he postponed their marriage until the death of her father removed any doubt as to the amount of her heritage; that he protected his estate against her, while he kept every benefit which the law gave him in hers. Nevertheless, the decision in the case cannot be controlled by his character or by his motives, nor is her gift to him invalidated by the undoubted fact that he did have a very real influence over her. Archaic as the idea may be in the lay minds, in deference to precedent, the law still attributes to the husband a certain influence over the wife, and indeed assumes that such an influence is natural and consistent with the established order of things. So that, while Lamp's influence over his wife, and her deference to his wishes, and her affection for him, should be considered with other relevant facts in determining the existence of a confidential relationship, no sinister inference should be drawn from those facts.

The gift of the savings account was apparently made in a very loose and irregular manner. There was no check or assignment transferring the account, but the transfer was effected by a signature card on which below Mrs. Lamp's signature was stamped: "In trust for self and J. G. Lamp, joint owner subject to the order of either, the balance at death of either to belong to the survivor." The name "J. G. Lamp" was written in a blank in the stamped legend by Lamp. There is nothing to show when that legend was stamped upon the card, whether it was there

when Mrs. Lamp signed it, whether she was in the bank when the transfer was made, or whether she spoke to any bank official concerning it, nor is there any direct evidence that Mrs. Lamp knew of the change. There is evidence, however, that Mrs. Lamp visited the bank from time to time, that statements of the account addressed to "Mrs. Anna K. Lamp, or J. George Lamp" at her home on Park Heights Avenue were mailed by the bank, and that on several occasions statements thus addressed were handed to Mrs. Lamp while visiting her husband's office. While those statements did not on their face show the terms of the trust account, she must have inferred, from the fact that they were addressed to her "or" to her husband, that they referred to a joint account.

Her business with the bank was almost entirely transacted by her husband, and in such a way that it is possible, but not probable, that she had no knowledge of how it was transacted. When money was to be withdrawn from the savings account, he would sign a withdrawal receipt and deposit the money in the checking account, and she would withdraw it from that account by checks signed by her alone, drawn in some instances to the order of the husband, as agent, and in one at least to him personally, a procedure which she may well have thought unnecessary if she had known that, as the account stood, her husband had the same right to check against it that she had.

A. Lee Gough, assistant secretary and treasurer of the bank, testified that on one occasion Lamp was in the bank talking to Clarence R. Evans, who is now dead, but was then in charge of it, and that later he returned to the bank with the two signature cards stamped as described above, and that he fixed up the accounts; that afterwards, on December 2nd, 1921, Lamp and his wife both came to the bank, and he fixed up the checking account by drawing a check to her order which read as follows: "No. 87, the American Bank, Baltimore, Maryland: Pay to the order of Annie K. Lamp $10,576.88, Ten Thousand, Five Hundred and Seventy-six Dollars and Eighty-eight Cents," and signed, "Katie Schluderberg," which was in-

dorsed by Lamp's handwriting as follows: "For deposit of Anna K. Lamp, J. G. Lamp." He also said that he had given the savings account book to "them." The testimony of that witness would be entitled to more weight had he not previously disclaimed any knowledge of the transaction. But giving full credit to it, it still does not necessarily mean that Mrs. Lamp was informed by anything that occurred at the bank of the fact that her money had been placed in the joint names of herself and her husband. When the deposits were first made, they were in the name of "Katie Schluderberg." The check, until it was indorsed, indicated nothing more than that the account was transferred from her maiden name to her married name, and there is nothing to indicate that she knew anything of the form of the indorsement. Nor does the statement that the bank book was delivered to "them" mean anything, in the absence of proof as to which of "them" received it.

In connection with these facts, it also appears that throughout there were available to Mrs. Lamp the services and advice of Mr. John H. Richardson, a competent and experienced lawyer, who had been her father's counsel and her own, had she cared to call upon him; that she did consult him on other matters subsequent to 1921; that he drew three wills for her; and that he gave a copy of at least one of the wills to Mrs. Tillinghast. Mr. Richardson also prepared her income tax returns, and attended to other matters for which she required the services of a lawyer. It also appeared that she had some business experience, for she had for several years owned and operated a hotel in Washington, and both before and after her marriage she managed and operated her household, and did the things ordinarily incident to such a responsibility, such as employing servants, keeping the property in repair, purchasing supplies, and the like.

Giving these facts their natural weight, it must be inferred that the two personal and sole accounts of Mrs. Lamp were transferred by her to the joint trust accounts with knowledge of the transfer and its effect. To assume

that that was not the case would be to charge that Lamp had, without her knowledge or consent, placed on the deposit cards the legend effecting the transfer, or, in other words, had uttered a forgery. There is nothing in the record to justify an inference so severe, and the improbability that such a fraud would for ten years have escaped the attention of Mrs. Lamp, who must in that time have seen, not only the periodical statements of her accounts, but who must also have seen time and again the savings bank book which bore the same legend, is so great that the charge of fraud is not entitled to serious consideration, especially when it is considered that in that time she made up, with the aid of an attorney, annual income tax returns in which naturally reference would have been made to that book. As we have said, the whole proceeding was loose and irregular. The accounts should under the circumstances have been formally assigned to the joint trust accounts. But it must be assumed that Mrs. Lamp knew what had been done, and, regardless of the manner in which it had been done, acquiesced in it for ten years, and by that acquiescence ratified it.

Such an action on her part was consistent with the entire history of her relations with Lamp. She was a generous, kindly woman, and she had been especially generous to Lamp. For years she had lavished the full measure of her affection and generosity upon him. It may be that he was unworthy of it, but that was for her to decide and not for others. Her property was her own to do with as she would, and, if she chose to give it to a husband whom undoubtedly she loved, no matter what his character or his just deserts may have been, no one has the right to question her act, so long as she knew what she did. No fair or reasonable inference should be drawn from the facts in this case other than that she did know of and intend to make transfers; there is no evidence direct or circumstantial to show that in making them she was affected by fraud, coercion, misrepresentation or undue influence and her acts cannot be disturbed now.

Mrs. Lamp died on January 25th, 1932; her will was probated February 3rd, 1932; and on the same day letters testamentary on the will were issued to J. George Lamp, the executor named in the will, and his renunciation and election was filed in the Orphans' Court on April 7th, 1932. One of the bequests to Lamp, under the will, was a market stall in the Broadway Market. Lamp used and occupied that stall after Mrs. Lamp's death as he had done before, until his retirement from business September 8th, 1933, apparently as a tenant, and he paid the license for the year following her death. Lamp was also given a life estate in Mrs. Lamp's home property on Park Heights Avenue, and he continued after her death to occupy that property until September 30th, 1932.

Upon those facts the appellant contends that Lamp's renunciation and election are invalid and ineffective, upon the generally accepted principle that one cannot at the same time accept benefits under a will and repudiate and nullify other provisions of it. So that, in respect to that contention, the question is whether Lamp's occupation of the dwelling house, and the market stall, and his qualification as executor, amount to an acceptance of the provisions for his benefit contained in the will. There was no evidence as to the terms of the lease upon which he held the market stall, the title to it was in him as executor until the estate was distributed, it was not assigned to him or at all, there is nothing other than the bare fact that he occupied it to show that he asserted any title to it, for, while it appears that he personally paid the license fee, it does not appear whether or not he was required to pay that expense under his lease, and it was listed as an asset of the estate, which was as consistent with his renunciation of the will as with his acceptance of it. Those facts are not sufficient to show anything more than that Lamp occupied the stall as a tenant after Mrs. Lamp's death, as he had occupied it before. Nor can it be inferred that, because he occupied the home property for about eight months after his wife's death, he accepted the devise of a life tenancy therein.

He was entitled to occupy it under the will, and he was also entitled to occupy it in common with other heirs of Mrs. Lamp, or with the remaindermen accordingly as it may be held that she died testate or intestate as to that property, a question which we are not called upon to consider.

A question of major importance, however, is whether Lamp's act, taking out letters testamentary on his wife's estate, was an acceptance of the will. Or, stated conversely, whether, having taken out such letters, he will be permitted to renounce the provisions for his benefit under the will, and elect to take his legal rights as the surviving spouse in the estate of the testatrix.

The act of renunciation was in the form prescribed by Code, art. 93, sec 311, and under it Lamp released and quitclaimed "any devise or bequest" made to him in Mrs. Lamp's will. His appointment as executor was neither a devise nor a bequest, so that his acceptance of that appointment and his qualification as executor did not, under the terms of the statute, prevent him from thereafter, within the time limited by the statute, renouncing the devises and bequests made in the will to him, and electing to take in lieu thereof his legal rights in his wife's estate. So that the question is whether, apart from the statute, his act in accepting the appointment by taking out letters testamentary on the will barred him from renouncing the provisions contained in it for his benefit and electing to take in lieu thereof his legal rights in the estate.

Counsel for the appellant contend with great force and earnestness that it does have that effect, and they have cited a number of cases from other jurisdictions which support that contention, but the rule in this state is otherwise. It was flatly decided in *Whitridge v. Parkhurst,* 20 Md. 62, 70, 72, that the act of a devisee named in a will, who was also named therein an executor, in taking out letters testamentary under the will, was not an election on her part to take under the will. And, while the precise question has not been presented to this court

since that case, the principle of equitable election expressed in that statement finds sufficient support in analogies found in other cases which have been decided. The essence of the doctrine is stated in *Beall and McElfresh v. Schley*, 2 Gill, 202, to be that: " 'No one shall be permitted to take under an instrument and defeat its provisions; or a person shall not claim an interest, under an instrument without giving full effect to that instrument as far as he can.' In *White's Eq. Cas.*, 65 L. L., 258, note, the foundation of the doctrine of election is stated in these words: 'That he, who accepts a benefit under an instrument, must adopt the whole of it, conforming with all its provisions and renouncing every right inconsistent with them.' " Which, in so far as the issue here is concerned, comes finally to this: Is the office of executor such a "benefit," within the meaning of the rule, that one who accepts it, by his acceptance elects to take under the will, and is barred from thereafter renouncing provisions for his benefit contained in it, and electing to take against it? *Lewis v. Carver*, 140 Md. 121, 117 A. 108.

In *Helfrich v. Yockel*, 143 Md. 375, 122 A. 360, it was held that the fact that an executor is to receive compensation out of an estate gives him no interest therein, for the compensation is given for services rendered, and he is expected to give full value therefor. In *McKim v. Duncan*, 4 Gill, 85, it was said that, by undertaking the office of executor, a person does not elect to give effect to all the provisions to be found in the will, and that such clauses as are inconsistent with the law constitute no part of the will, and it was there decided that the executor could claim commissions, although the will provided that none should be allowed. In *Schloss v. Rives*, 162 Md. 347, 159 A. 745, citing *McKim v. Duncan, supra, State v. Baker*, 8 Md. 44, *Handy v. Collins*, 60 Md. 229, it was held that a testator cannot deprive an executor of commissions, and in *Helfrich v. Yockel, supra*, that the fact that one was named as executor in a prior will gave him no right to caveat a subsequent will revoking that appointment.

The reasoning underlying the conclusions in those cases is that the office of executor is not a bounty which the testator gives away as property, but a trust to be reposed in some person selected by him to execute and administer the provisions of his will. It is true that for that service the executor receives compensation, but the extent of the compensation is not fixed by the testator, but, within defined limits, lies in the discretion of the orphans' court, and is or should be measured by the skill and fidelity with which the executor discharges his trust. The mere administration of the estate has no such effect upon its quantity or character, as would a devise or a legacy, for the compensation paid the executor is paid as an expense of administration.

Nor is the act of a husband in renouncing the devises and bequests made to him in his wife's will, and electing to take his legal rights in lieu thereof, in itself so hostile to the will as to prevent him, as a matter of law, from administering it. Whoever administers the estate, whether he or another, must be bound by the same will and the same law. An executor is selected because the testator has confidence in the appointee, and believes that he will faithfully and efficiently carry out the provisions of the will, but he distributes his estate to those who in his judgment have the nearest and best claims upon his bounty and his generosity, with no necessary consideration of their administrative skill, or executive ability. These conclusions are not only in harmony with former decisions of this court, but with what seems to be the weight of authority elsewhere.

Mr. Miller, in his *Construction of Wills*, relying on *Whitridge v. Parkhurst, supra,* states that "taking out letters testamentary under a will is not an election to take under that will" (*Miller, Construction of Wills*, sec. 337, n, 4), and in *Adams v. Adams* (1923) 95 W. Va. 187, 120 S. E. 590, the court cited *Whitridge v. Parkhurst, supra,* as authority for the statement that "this act," referring to her act in taking out letters testamentary, "on her part standing alone would probably not estop

her to renounce the will." In 82 *A. L. R.* 1535, 1536, the state of the law is illustrated by two statements: (1) That "in some cases it has been held that where a widow qualifies and acts as executrix, it must be presumed that she elects to take under her husband's will"; and (2) that "some cases have held that a widow does not elect to take under her husband's will though she qualifies as executrix." In support of the first statement are cited cases from Missouri, New Hampshire, North Carolina, and Texas, although the case cited from Texas (*Dunn v. Vinyard* (Tex. Commn. App.) 251 S. W. 1043), treats the act of qualification as evidence of an election rather than as an election. In support of the second statement are cited cases from Alabama, California, Florida, Illinois, Indiana, Iowa (prior to a statute enacted in 1924), Kentucky, Ohio, Oregon, and Virginia.

In *Underhill, Wills,* sec. 735, it is said: "It cannot, as matter of law, be said that the fact that the person who has the right to elect accepts the office of executor under the will, performs the duty of that office and receives proper compensation therefor, or even a specific legacy for his trouble, which would be remuneration for services and not bounty, constitutes an election on his part to take under the will." In *Woerner, American Law of Administration,* page 403, it is said, after referring to cases against the proposition: "But in most states mere probate and qualifying as executor or executrix is not given such effect, and hence, with better reason, the rule that this does not in itself constitute an election to take under the will is laid down." And, in a general discussion of the doctrine of election, the author adds: "Since it may be the duty of an executor to submit a will for probate, and since the executor's commissions are deemed a fair compensation for administering the testator's estate, it would seem that neither the mere proving of the will, nor qualifying as executor thereunder, ought in fairness to defeat the right of election." *Id.,* p. 1589. In 40 *Cyc.* 1978, 1979, it is said: "An election to take under the will may be manifested by qualifying and acting as

executor, administrator *cum testamento annexo,* or trustee under it, especially where there are other circumstances indicating an intention to take under the will; but the fact that one qualifies and acts as executor is not necessarily inconsistent with an intention to renounce the provision of the will in favor of the person so acting, and hence does not necessarily amount to an election to take under the will."

While undoubtedly there are well considered cases to the contrary, the better rule, and one consistent, not only with former decisions of this court, but with sound reason and the weight of authority elsewhere, is that, where a legatee or devisee under a will, who is also named therein as executor, qualifies as executor under the will, his act in so qualifying is not, in and by itself, sufficient to establish an election to take under the will, but may be considered in connection with other facts and circumstances, as evidence of such an intention.

In this case, Lamp, within the period limited by the statute, formally renounced the devises and legacies made to him in the will, and elected to take his legal rights in his wife's estate. There is no sufficient evidence of any acts *in pais* which would have estopped him from thus renouncing and electing. For reasons stated, his tenure of the market stall and the Park Heights Avenue property had no such effect, and it does not appear that in the course of his administration he has done anything inconsistent with his election to take his legal rights in the estate rather than the benefits given to him by the will, or that he has done anything which he was not bound as executor under the will and the law to do, whether his election was valid and effective, or null and void. Under those circumstances, his qualification as executor, and his administration of that office, were not sufficient to constitute an election to take under the will, or to estop him from exercising his statutory right to renounce the devises and legacies made to him in it, and to elect to take his legal rights in the estate in lieu thereof.

For these reasons, we concur in the conclusions of the learned chancellor who tried the case below, and the decree appealed from will be affirmed.

*Decree affirmed, with costs.*