JAMES H. BEARD *v.* CATHERINE BEARD

[No. 7, October Term, 1945.]

*Decided November 1, 1945.*

The cause was argued before MARBURY, C. J., DELAPLAINE, COLLINS, GRASON, MELVIN and MARKELL, JJ.

*H. Mortimer Kremer* and *William Taft Feldman* for the appellant.

*John E. Magers* for the appellee.

MARKELL, J., delivered the opinion of the Court.

In this case a wife (plaintiff, appellee) filed a bill against her husband (defendant, appellant) for an accounting for the profits and proceeds of an alleged partnership between them.

At the time of the hearing the parties had been married twenty years, had lived together until a few months before, and were still living in the same house, although the husband had recently filed a bill for divorce. For years they lived happily in moderate circumstances and through adversity. Recently prosperity has been followed by domestic and pecuniary discord.

In 1926 the husband and wife acquired half, in 1928 the other half, of the stock of the Liberty Cab Company. He was president, she secretary and treasurer. The business was conducted by him, with an associate until 1928. In the depression the corporation went into a receivership. In 1933 Beard incorporated the New Liberty Cab Company. On application to the Public Service Commission for taxicab permits he testified that he and his wife had conveyed to the new company the cabs and other assets of the old (purchased from the receivers) for fifty shares of stock of the new. For these fifty shares (the only stock issued) one certificate was issued in the names of Beard and his wife, signed by him as president and by her as assistant treasurer and secretary. To launch the new company they borrowed $300 on their furniture; she says (he denies) that she also borrowed $400 from a friend. The company paid no dividends; she got no income from it. She had no bank account. He received a salary of $100 a week, on which they lived. He conducted the business.

In June, 1937, they sold the fifty shares of stock for $37,500. The contract of sale was signed by each of them individually, by the corporation by them as president and secretary respectively, and by the purchaser. The price was payable, $10,000 forthwith, $2,000 per month for thirteen months, and $1,500 after another month, with

interest at 5 per cent. Just before the sale, pursuant to consultation between Beard, his counsel and his accountant, the fifty shares were transferred into two certificates for twenty-five shares in the name of each spouse. Payment was made to each by check for $5,000 and monthly checks for $1,000 (and $750) with interest.

At the time of the sale the two checks were deposited in separate bank accounts with the Equitable Trust Company, one account in the name of each. As the monthly checks were received, hers were endorsed and turned over to her husband. Some of their monthly checks were deposited in bank accounts in his name at the Equitable or elsewhere, some in an interest-bearing account in the names of both as joint owners, opened in January, 1938, with a federal savings and loan association. They also had a savings account in their joint names, opened in October, 1937, with the National Central Bank. In December, 1937, they went together to the Equitable, drew out their balance on counter checks, and she turned her $5,000 over to him. The money they thus drew out was deposited by him in some other bank account in his name.

Except for 1937 and 1938 the wife has filed no federal income tax returns. For 1937, at the instance of her husband and his tax advisers, she and he filed separate returns, each including half of the profit from the sale of the New Liberty Cab stock. For 1938 they filed a joint return. He says he saved about $3,300 by filing separate returns, instead of a joint return, for 1937.

For about a year after June, 1937, Beard was not engaged in any business. He says he was tired and told his wife he "was going to take it easy for awhile." At the end of December they took a trip to California, and later to Florida, returning in March, 1938. The wife then went to a hospital for a serious operation. She was in the hospital for five weeks.

In May or June Beard obtained a lease of a building on Baltimore Street, which he remodeled for a restaurant and tavern. In September, he opened it as "Beard's

Cafe." The liquor license was obtained in his name; in the application he said that no other person was pecuniarily interested in the business. He says he "used about everything he had to start the place" — about "$28,000 of the $37,500." He "went overboard on it." He "cleaned out all the banks" and the loan association account. The business lost money in 1938 and 1939. In 1939, while it was losing money, he and his wife, to keep it afloat, mortgaged their house, which they own as tenants by the entireties, for $2,500, and also assigned their loan association account to secure other loans aggregating $1,700. After 1939 the business made subtantial profits. On June 3, 1943, it was sold, at a profit, for $33,000; $20,000 was paid in cash, the balance in weekly payments of $250. Mrs. Beard received no part of the proceeds of the sale or the profits of the business.

Beard testified that everything he had was his and his wife's property. He says he put the stock in both names for her protection. Nevertheless, he says he owned the company. "I did not have to get my wife's consent to sell out this business. I always conducted the business myself, and I did not have to ask no questions. I was under no obligations to anybody. * * * The only thing my wife knew I told her I was going to sell the Cab Company." He was "always figuring" he was boss of his own money and his wife's too—and "always acted that that way." His wife always trusted him. "We never had any arguments about the business or anything." "There was never any question about money in my home."

When he and his wife each deposited $5,000 in a separate account with the Equitable, he says he "always thought that $10,000 deposit" was his. When she turned over her monthly checks or her $5,000 to him, she knew he was depositing the money in his own name. She says she turned the checks over to him for deposit; he was looking around for something to go into; when she gave them to him she did not say anything; she just endorsed them and turned them over to him because they were going into some other business; at their age "and that

little bit of money" they could not afford to retire; there never was a question of money between them; she always trusted him to use the money, whoever it belonged to, to the best of his ability. When she turned over the $5,000 she was expecting to go to the hospital. "My health was bad, and I did not want the money in my name. I did not know whether I was going to live or not, and I thought with all the other money in his name, and it belongs to both of us, * * * I would put that into the bank before I went into a hospital so that there would be no question about it, because I always figured what we had belonged to both of us, and when I left this world everything should belong to him."

On June 23, 1943, Mrs. Beard found that her husband a few months before had purchased two $5,000 war bonds, each in the names of himself and George Brennan, a friend. She asked him why he put the bonds in Brennan's name instead of hers, because whatever they had owned or had they had between themselves and not outsiders. He told her he did not trust her (referring to a "scene" in 1941 when he saw a man's arm around her at Beard's Cafe) and that was why he put them in Brennan's name. A few weeks later he said that if anything should happen to him, Brennan would see that she got the money. She never had any reason to mistrust him until she found out about these $10,000 of bonds.

On July 20, 1943, the bill in this case was filed. A demurrer to the bill was sustained; the amended bill was filed on October 28, 1943. The amended bill alleges that a partnership, by verbal agreement between Beard and his wife, as equal partners, to conduct the restaurant and tavern business, continued from August 15, 1938, to June 3, 1943, and prays an accounting. The lower court found no partnership, but held that the business was a "joint adventure" between the Beards and decreed that he pay her $21,500, representing one-half of (a) the $33,000 received from the sale of the business and (b) the $10,000 invested in war bonds. From this decree the defendant alone has appealed.

Mrs. Beard says (he denies) that after Beard's Cafe had been opened, and after she regained her health, she was there every night, as a sort of general superintendent to see that the business went along; when he was at home sick for five weeks, or in Florida, she "ran the business" and made deposits in bank. In 1941 or 1942, on account of the "scene" with a man, he told her to stay out of the place; from that time she kept out of the place altogether. She never received any income from the business, as such, or any accounting. He has always supported her liberally. The winter after this case was instituted, they took a trip together to Florida. She says if he had given her a financial statement of the business she could not have understood it, and therefore she trusted him and depended on him to take care of everything to the interest of both of them.

We agree with the lower court that there was no partnership. Mrs. Beard was inexperienced in law and business and unfamiliar with the difference between stock ownership in a corporation and membership in a partnership. She may have thought she and her husband were, in a more than figurative sense, "partners" in the cab business and in the tavern business. But the elements of a partnership are lacking, even in her own testimony. "The main test of whether or not a partnership exists is the intention of the parties to create a partnership." *Collier v. Collier,* 182 Md. 82, 88, 32 A. 2d 469, 471. The burden of proving a partnership is upon the party who asserts it. *Id.* The intention, at least on the husband's part, to create a partnership is wholly lacking and is negatived in words and in deeds, *e. g.,* in his liquor license and his income tax returns.

For the same reasons we are unable to find a joint adventure. The intention of the parties is essential to create either a partnership or a joint adventure. In this respect, there is "no 'real distinction between a joint adventure and what is termed a partnership for a single transaction'." *Atlas Realty Co. v. Galt,* 153 Md. 586, 590, 139 A. 285, 286. To constitute a joint adventure, the parties "must intend to be associated as partners, either

as general partners, or merely for the duration of the joint adventure." *Brenner v. Plitt*, 182 Md. 348, 355, 34 A. 2d 853, 857.

We agree with the lower court "that Mrs. Beard never intended to make a gift of her money to Beard. It is true she turned it over to him and he used it to set up the business and to keep it going, but there is not one word in the testimony to show that she intended to relinquish her property in the funds when she transferred them to Beard." This is equally true of her testimony and of his. She says she thought what they had belonged to both of them. He says he thought the money was already his. Each was mistaken.

If the cab stock was paid for by him alone (which she denies) and he had it put in their names as tenants by the entireties, then her interest in it was a gift from him to her. After sale of the stock while so held, the proceeds (though deposited in his name) would still have been owned by them as tenants by the entireties. *Brell v. Brell*, 143 Md. 443, 447, 450, 122 A. 635. That tenancy, however, was severed before the sale transferring half of the stock to each. After the sale, the proceeds of her stock were still hers. If all the stock was actually his, then the transfers and the income tax returns effected a fraud upon the Government. There is no evidence whatever that she was a party to any such fraud.

A clear and unmistakable intention on the part of the donor to make a gift of his property is an essential requisite of a gift. *Hutson v. Hutson*, 168 Md. 182 189, 177 A. 177. *Thornton on Gifts and Advancements*, Sec. 70.

Even if Mrs. Beard's acts in turning over her checks and money to her husband effected a gift, the gift could not be sustained in equity. In *Tillinghast v. Lamp*, 168 Md. 34, 47, 48, 176 A. 629, 634, a husband contended that in this State "the conventional doctrine of confidential relations" is not applicable to transactions between husband and wife; he cited *Hillwood v. Hillwood*, 159 Md. 167, 172, 175, 150 A. 286; *Brell v. Brell, supra,* 143 Md. 449, 450, 122 A. 635; *Lewis v. Lewis,* 140 Md. 524, 527, 118 A. 65; *Reed v. Reed,* 109 Md. 690, 72 A. 414, 130 Am. St. Rep.

552; *Taylor v. Brown,* 65 Md. 366, 372, 373, 4 A. 888. The Court said that while those cases "do not deal with the question of the burden of proof, or with the confidential relations by name, nevertheless they leave an implication contrary to the weight of authority elsewhere, that the marital status is not *in itself* sufficient to establish a confidential relationship." (Italics supplied.) 168 Md. 48, 176 A. 634. The Court did not say that a confidential relation could not be established between husband and wife by additional facts in conjunction with the marital status.

The transactions involved in that case were transfers from the wife's bank accounts to joint accounts in trust for herself and her husband; her husband at least aided, if he did not direct, that transfer. The Court said: "With that background, under the conventional doctrine of confidential relations, the burden would have been upon the husband to show that the gift was with the free consent of the donor, that the transaction was fair, that there had been no abuse of the confidence, and that the gift was the 'pure, voluntary and well understood act of the other'," citing *Beach, Eq. Jur.,* 141; *Pomeroy, Eq. Jur.,* Sec. 956. 168 Md. 47, 176 A. 634. If a confidential relationship between husband and wife can ever be established in Maryland, Mrs. Beard's complete blind trust in her husband and reliance upon him, as shown by her testimony and by his, would seem sufficient to establish such a relationship.

In the instant case it is not necessary to go further than the cases cited in *Tillinghast v. Lamp, supra.* "* * * a wife may dispose of her property by gift to her husband as fully and effectually as if the transaction were between persons not occupying that relation, but, because of the natural dominance of the husband and the trust and confidence commonly incident to their union, the gift will be closely, carefully and vigorously investigated in a court of equity, and be annulled if obtained by fraud, coercion, misrepresentation, or undue influence." *Hillwood v. Hillwood, supra,* 159 Md. 172, 150 A. 288, quoted in *Tillinghast v. Lamp.* If Mrs. Beard disposed of her $18,750

by gift to her husband, she did not understand what she had done; she was unduly influenced by her trust and confidence in her husband and by his dominance. Any such gift must be annulled.

Beard estimates, without supporting evidence of details, that before the opening of Beard's Cafe he spent "about $9,000 of the $37,500" on living expenses (including the trips to California and Florida and his wife's hospital expenses), his and her income taxes and the fees of his counsel and his accountant. There is nothing to indicate the amount of these fees except a deduction in the income tax returns of $1,300 for "expense of sale." He says his income taxes and his wife's were each about $400. If upon the sale of the cab stock Beard and his wife had been or became partners, it might be only fair that they should share expenses out of the $37,500 until that money became productive by investment in another business. But it would be unjust and unreal to regard only Beard's money as breeding money and his wife's as being consumed in living expenses until it was put in his business. As he gets the fruits of the business, his money should bear the expenses before it became fruitful.

Mrs. Beard's $18,750 should be repaid without any deduction, and without interest. She did not ask or receive interest, but she has been liberally supported by her husband. He also paid the expense of sale of the stock and her income tax—and received the interest on the monthly payments and on the savings accounts. Though she did not make a gift of her $18,750 to her husband—certainly not a gift that can be sustained in equity—she did, in effect, during the years in question, contribute the fruits of this money toward the joint adventure of living.

The decree will be reversed and a decree entered for the appellee for $18,750.

> *Decree reversed and decree entered for the appellee for $18,750, costs in this Court to be paid by the appellee, all costs below by the appellant.*