OWEN P. W. OWINGS *v.* MARIANNA CURRIER, ET AL.

[No. 150, October Term, 1945.]

*Decided June 13, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*George B. Woelfel* for the appellant.

*Eugene P. Childs* for the appellees.

MARBURY, C. J., delivered the opinion of the Court.

The bill of complaint in this case was filed by the appellant against two daughters of his deceased wife by her first marriage, for the purpose of having declared null and void two separation agreements which he had made with his wife after marriage, and of having established his statutory right as surviving spouse in certain real estate conveyed to the defendants by his wife about six months before her death. The defendants set up the agreements as a bar to any right appellant might have in the property left them by their mother. The issue before the Court was the validity of these agreements. From a decree dismissing the bill, the appeal was taken here.

It appears from the record that at the time of the marriage, in 1932, Mrs. Owings owned a forty-five thou-

sand dollar residence property near Annapolis, and the appellant testified that he was then worth about twenty-thousand dollars in personal property. On September 21, 1942, the first separation agreement was executed. The appellant's testimony as to what occurred is that they separated on September 3, 1942. At the time he was working at the Experimental Station and he gave her practically all the money he made, but they did not seem to get along, and finally one day they decided they were going to see a lawyer. Mrs. Owings went to see her lawyer. He came and talked the matter over with both of them. Mrs. Owings wanted more money than appellant could give her, so the only thing he could do was to leave. He said he was forced to leave but did not explain how. After he left, they apparently saw each fairly frequently, and at times went out to dinner together. Then appellant contracted pneumonia, his wife visited him, and looked after him, and he finally returned to live with her in June, 1943. He then lived at her home until her death in February 1945. At the time they became reconciled, they executed a second agreement dated June 3, 1943.

The first agreement of September 21, 1942, recited that differences had arisen between Owen P. W. Owings and Anna T. Owings, his wife, in consequence of which they had separated and intended for the future to live apart, and desired to enter into an agreement as to their personal and property rights. Appellant covenanted with his wife that she could at all times live separate and apart from him and free from his authority, and he would not molest her in any way; that all property, real, personal and mixed, that she then had or might thereafter acquire, or such property as was held by her subject to his marriage rights, should be her sole and separate property wholly free fom any rights of the appellant during her life or after her death, with full power to her to convey, assign, charge or will the same as if unmarried, and that the appellant would not, at any time, claim any right in any such property as husband, widower,

heir, next of kin or successor, and that appellant would execute such deeds and papers as might prove necessary or convenient to enable her to deal with her said property as if unmarried. In consideration of this agreement by the appellant, Mrs. Owings covenanted that she would not molest him, would not incur any debt or obligation on his account, would hold him harmless from any and all liabilities incurred by her, and would not bring any suit of any kind to compel him to pay her support, maintenance or alimony, waiving all her rights thereto. She further agreed that she would not claim any interest as a wife, widow, heir, next of kin or successor in his property, and that she would execute any necessary papers to permit him to dispose of his property. The agreement also states that it is fully understood by the parties, that it shall be a full release and discharge of each in the property of the other. There was another provision that notes outstanding in various banks, amounting in all to $690, should be paid by the parties in equal amounts, and inasmuch as the appellant had no property subject to attachment or execution, Mrs. Owings retained his furniture and silverware as security for his carrying out this obligation.

The second agreement recites the first agreement and the fact that the parties had agreed to live together again, and, therefore, it became necessary for them to nullify the other contract insofar as their individual personal rights were concerned, but to confirm the same so far as it related to their individual property rights. The parties agreed that such property rights should remain as set forth in the first contract and confirmed the latter with the proviso that each party might provide for the other by will, but this provision is stated to be not mandatory but discretionary. Appellant also agreed that he would pay his wife as long as he was earning the salary he was then receiving, the sum of $25 a week, and would continue to pay her a sum commensurate with his earning capacity, and that neither party would incur any debt or obligation on account of the other.

On August 9, 1944, Mrs. Owings conveyed to the appellees, who, as above stated, were her daughters by her first husband, the remainder after her own death of her real estate in Anne Arundel County, reserving in herself the power to mortgage, sell or convey the property. She died without having executed this last power, so that the appellees became vested with title to the property, subject to the curtesy or marital interest of the appellant in case the agreements are invalid, as he claims, or free of such rights of the appellant if the agreements are valid.

The appellant was asked why he signed the first agreement, and he said because he did not have money to keep the property up. He had spent the greater part of the money he had when married in the support of his wife and her home during the first 10 years of their marital life. It was an expensive piece of property, his earning capacity was not great, he was dissatisfied, and he thought the best thing for him to do was to leave; that his wife agreed to it, and said that if he would sign off she would release him from any alimony, so he said all right. He was advised that he could get an attorney to represent him, but he did not do so. On the date of the signing of the first agreement he was worth altogether six or seven thousand dollars. He acknowledged signing and executing the second agreement, and said, that, after the reconciliation, he and his wife got along all right. His wife excuted a will, about which she told him, which left the real estate in trust for the use of her daughters and for him for a period of five years, at the end of which time the trust should cease and the property should vest in the daughters, subject to an owelty for his benefit for five thousand dollars which was to be a lien upon the property. She also left him her engagement ring and her automobile. This will was made on May 4, 1944, while they were living together, and less than one year before her death. If the subsequent deed to the real estate is valid under the separation agreements, then, of course, the will is inoperative as to the

real estate. However, the appellant renounced this will. He was requested to sign the deed to the appellees, and he said his explanation of why he did not sign it was because he did not care to sign it. He had signed some papers and would not sign any more. But one of the daughters testified that when he was asked to sign it, he said he had no interest in the property and it was not necessary for him to sign any more papers. The appellant said he performed his part of the first agreement by paying off the notes. He felt that he wanted to live under the first agreement, and would rather do that than go back to his wife. He said he tried to live up to both agreements. He was not satisfied with the terms of the will, but his wife was ill, and he said that he was satisfied, because he did not want to worry her about it. That when he waived all his rights in Mrs. Owings' property, she told him he would not have to pay alimony, and he was then much worried about finances and other things. There was some conflicting testimony produced as to the personal relations between the appellant and wife, and as to his habits and his attitude towards her and towards her daughters and her mother. This has some bearing on the reasons for the separation, as it appears that the household was not always completely harmonious.

The bill alleges that the wife conceived the idea to defraud the appellant and in pursuance of such plan, constantly nagged him to such an extent that she forced him to leave her home under the pretext that she would not ask him for alimony or support and that all he would have to do would be to get out and go to her lawyer's office and sign the papers. And that having gotten the agreement signed, the wife carried out the idea of willfully defrauding her husband by executing the deed to her children. And that the bequest in the will was made for the purpose of pacifying and silencing her husband. But the testimony of appellant falls short of proving these allegations. The evidence produced by him, viewing it in the most favorable light, is that, due to his wife's nag-

ging about money, it was thought best by both of them that they separate. He was willing to give up his rights in her property if she gave up her rights in his and if he did not have to give her money for her support. There does not seem to have been any fraud or force or undue. persuasion exercised by the wife, and the settlement agreements were both freely entered into by each of the parties.

Appellant also contends, apart from the question of actual fraud, that a confidential relationship exists between husband and wife, and that the wife, who in this case was the dominant party, by her actions forced him to leave her on account of his fear of having to pay alimony, which he claims he would not have had to pay under the circumstances. As a result he entered into an agreement in which he gave up his right to a $45,000 property, while his wife only gave up her rights in his property, which was very much less valuable. He asks the Court to void the agreements on the ground that they are unfair and inequitable.

In *Restatement of the Law, Contracts,* paragraph 497, it is said "Where one party is under the domination of another, or by virtue of the relation between them is justified in assuming that the other party will not act in a manner inconsistent with his welfare, a transaction induced by unfair persuasion of the latter, is induced by undue influence and is voidable." In Comment A on this section is found the following statement, "The relationships that ordinarily fall within the rule are those of parent and child, guardian and ward, husband and wife, physician and patient, attorney and client, clergyman and parishioner. In each of these cases, however, it is a question of fact whether the relationship in a particular case is such as to give one party dominance over the other, or put him in a position where words of persuasion have undue weight." In paragraph 584 it is stated, "* * * a bargain between persons who are married * * * * made after separation or in contemplation of an immediate separation which takes place as contemplated, for a

division of assets or for future maintenance or alimony, is legal if the bargain is a fair one in view of the circumstances of the parties." In *Williston on Contracts*, Revised Ed., paragraph 1625 A, it is said, "In the absence of a relationship between the parties to a transaction which tends to give one dominance over the other, undue influence must generally be proved by the party setting it up and will not be presumed." As pointed out in *Coomber v. Coomber*, [1911] 1 Ch. 723, this doctrine does not rest merely upon the existence of a fiduciary relationship, but is applied only on those in which normally one party occupies a position of dominance toward the other. *Williston* further states that where a relationship of dominance exists it throws upon the dominant party the burden of establishing the fairness of the transaction, and that this principle has been generally applied to gifts rather than to contracts, but is not confined to such cases. Two New Jersey cases are cited as authority for the statement that a deed from a husband to a wife will be presumptively invalid if in fact the wife is shown to be the dominant party. *Haydock v. Haydock's Ex'rs*, 34 N. J. Eq. 570, 38 Am. Rep, 385, and *McCambridge v. Daly*, 109 N. J. Eq. 43, 156 A. 372.

In the Haydock case an aged and infirm husband had given his wife, within two months before he died, stocks and bonds, and a promissory note for $5,000. The Court said that the evidence impressed him with the conviction that at the time when the transfers were made, the mind of the husband approached so closely to the line which defines the limit of legal mental capacity, that he should be inclined to hold the gifts were void on this ground. However, he went on to say that upon the theory that the husband was a person who possessed sufficient mental power to make a gift, he thought under the circumstances the duty was upon the recipient, that is, the wife, to show the fairness of the transaction, and he stated the situation and the law applicable to it in the following words: "Here was a man of weak mind and body. All the evidence in the cause shows that the wife was the

one upon whom he naturally leaned. She watched his movements and cared for his wants, and he submitted himself to her control. She naturally and necessarily became the head of the house. While they so lived together, and while none but the wife and her brothers were about him, without the advice of disinterested counsellors, the old man made these gifts of which she was the recipient. I take the rule to be settled that where a person, enfeebled in mind by disease or old age is so placed as to be likely to be subject to the influence of another, and makes a voluntary disposition of property in favor of that person, the courts require proof of the fact that the donor understood the nature of the act, and that it was not done through the influence of the donee. *Huguenin v. Baseley*, 2 L. C. in Eq. (4th Am. Ed.) notes, pp. 1183-1185, American notes, pp. 1192-1194." In the McCambridge-Daly case a saloon keeper, who had been a heavy drinker, suffered from mental depression and was morbid, conveyed his saloon property, which was his sole support, to his wife. He subsequently died in the State Hospital for the Insane, but the Court did not find in him a lack of mental capacity at the time he made the deed. In striking down the deed the Court said, [109 N. J. Eq. 43, 156 A. 373] "Though he was not incompetent, the condition of McDonald's health and his admitted dependence upon his wife, however, puts upon her the burden of showing that he understood what he was doing when he made the deeds and that he was not unduly influenced." Both of these New Jersey cases were concerned with voluntary gifts where it was shown that the wife occupied a position of dominance in the family at the time they were made.

In the English cases, a presumption is not applied to the relation of husband and wife, but will depend on actual proof of dominance. It was decided in *Nedby v. Nedby*, 1852, 2 De G. & Sm. 377, that a voluntary appointment by deed by a wife in favour of her husband will not be set aside merely on the ground of the relationship between them. The doctrine of *Huguenin v. Baseley*, 14

Ves. 273, does not apply. This was followed in *Barron v. Willis,* [1899] 2 Ch. 578. In that case Mr. Justice Cozens-Hardy said "* * * there is no presumption that a voluntary deed executed by a wife in favour of her husband and prepared by the husband's solicitor is invalid. The *onus probandi* lies on the party who impugns the instrument and not on the party who supports it." See discussion in 151 *Law Times* 313 (1921).

The general subject is discussed in a note to the case of *Hughes v. Leonard,* 66 Colo. 500, 181 P. 200, 5 A. L. R. 817, the note begining at page 823. In that note cases are shown where both husbands and wives attempt to set aside separation agreements, and it is stated to be the general rule that in jurisdictions where husbands and wives have equal contract and property rights, separation agreements not disclosing on their face any injustice and inequity are presumptively valid and the burden to prove that their execution was caused by coercion, fraud, or mistake is upon the party making the allegation.

The right of a married woman to contract with her husband has been recognized in this State for many years. Code 1939, Article 45, Sec. 20. Prior to the grant of such right, agreements which were fair in all respects were frequently sustained by the application of estoppel. An agreement by a wife to release her dower in her husband's property was upheld by this Court in the case of *Hill v. Boland,* 125 Md. 113, 93 A. 395. An agreement of separation was held to be valid as to property rights, but invalid as to marital rights in the case of *Melson v. Melson,* 151 Md. 196, 134 A. 136. In the late case of *Brooks v. Brooks,* 184 Md. 419, 41 A. 2d 367, a wife attempted to set aside an agreement of settlement on the ground that she was confused and did not fully comprehend the situation. She was represented by counsel. We held that she had shown no such ground and refused to strike down the agreement, although it gave her less than the property to which she might otherwise have been entitled.

In the case of *Livingston v. Hall*, 73 Md. 386, 21 A. 49, 51, this Court, speaking through Chief Judge Alvey, said "A voluntary contract or agreement, that is, without valuable consideration as between husband and wife, a court of equity will never enforce; but, where such agreements have been consummated, a court of equity will uphold them, and give them effect, provided they have been in all respects just and fair, and not to the prejudice of creditors." And the Court further quoted 2 *Story's Eq.* Sec. 1395, "But, at the same time, courts of equity examine every such transaction between husband and wife with an anxious watchfulness, and caution, and dread of undue influence, and, if they are required to give sanction or effect to it, they will examine the wife in court, and adopt other precautions to ascertain her unbiased will and wishes." Both of these quotations were repeated in the case of *Reed v. Reed*, 109 Md. 690, 72 A. 414, 130 Am. St. Rep. 552, and in addition the court referred to a statement in *Farmer's Executor v. Farmer*, 39 N. J. Eq. 211, 216, that gifts by a wife to a husband "are to be closely inspected on account of the danger of improper influence, but if they appear to be fairly made and to be free from coercion and undue influence they ought to be sustained." In the case of *Hillwood v. Hillwood*, 159 Md. 167, at page 172, 150 A. 286, 288, the Court said, "The law on this subject is familiar. It is that a wife may dispose of her property by gift to her husband as fully and effectually as if the transaction were between persons not occupying that relation, but, because of the natural dominance of the husband and the trust and confidence commonly incident to their union, the gift will be closely, carefully, and vigorously investigated in a court of equity, and be annulled if obtained by fraud, coercion, misrepresentation, or undue influence."

This last statement is repeated in *Tillinghast v. Lamp*, 168 Md. 34, at page 48, 176 A. 629, 634, where the Court was examining the law as to transactions between husband and wife. It had been suggested that where a wife transferred her sole and separate estate in certain funds

to joint accounts for herself and husband, the burden was upon the husband under the conventional doctrine of confidential relations to show the transaction was fair and there had been no abuse of confidence. The Court quoted, in support of that general doctrine, *Beach, Eq. Jur.* 141, *Pomeroy, Eq. Jur.*, Sec. 956, to the effect that "because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites." The Court said that the rule recognized in this State was that laid down in *Hillwood v. Hillwood, supra,* already quoted. The general question was again discussed in the recent case of *Beard v. Beard,* 185 Md., 178, 44 A.2d 469, 473. In that case the husband and wife were engaged together, first, in the cab business, and then in the tavern business. In that case we made a distinction. The stock in the cab company, paid for by husband, which he put in the name of himself and wife, as tenants by the entireties, was held to be a gift from him to her, so far as her interest in it was concerned. On the other hand, when the stock was sold and she received half the proceeds and gave them back to her husband to go into the tavern business, it was held that this was not a gift from her to him. The theory on which this was done was that the husband was the dominating figure in this particular marriage, and the wife never intended to give up her property. The Court discussed all the previous cases which we have referred to and said, "If a confidential relationship between husband and wife can ever be established in Maryland, Mrs. Beard's complete blind trust in her husband and reliance upon him, as shown by her testimony and by his, would seem sufficient to establish such a relationship." In another recent case of *Levy v. Sherman,* 185 Md. 63, 43 A. 2d 25, 29, we had before us an antenuptial contract by which a wife agreed to take much less than her legal share of her

husband's property if he predeceased her. After her husband's death she filed a bill to void the contract. One of the questions was whether the parties, before they were married, occupied such confidential relationship with each other, that the burden was placed upon the representatives of the husband to show the contract was fair and equitable. This Court, speaking through Judge Grason, discussed many cases from other jurisdictions, and declined to attempt to reconcile them, but laid down the rule as to such agreements, in the following words: "We think when an antenuptial contract is entered into in contemplation of marriage, whether the parties are engaged to marry at the time or not, it is required of each to make a frank, full, and truthful disclosure of their respective worth in real as well as personal property. And in such cases where the disclosure of worth is not full and frank, fair and truthful, and the allowance provided in the agreement is unfairly disproportionate to the worth at the time, the concealment gives rise to the implication of fraud, and the burden of proof is cast on those claiming under it when the instrument is attacked, to show that it was entered into freely, voluntarily, and knowingly and that each was given the opportunity to obtain independent legal advice."

The appellant urges upon us a decision of the Supreme Court of Delaware, *Peyton v. William C. Peyton Corp.*, 23 Del. Ch. 321, 7 A. 2d 737, 746. The Court, in that case, stated the rule as follows: "Confidential relations are presumed to exist between husband and wife. The most dominant influence of all relations is that of husband over wife; and the relation is confidential to the highest degree. There are exceptional cases, of course, where the woman is the more masterful; but, generally speaking, the trust of the wife is so absolute and her dependence so entire, while the dominion of the husband is so complete and his influence so controlling, that equity scrutinizes severely all transactions between them; for, in the proportion to the affection and trust is the probability of the wife to be subject to the husband's

influence, and in the same proportion is the vigilance of the court aroused. Confidential and fiduciary relations have the same meaning in law; and as every fiduciary relation implies a condition of superiority of one of the parties over the other, equity raises a presumption against the validity of a transaction by which the superior obtains a possible benefit at the expense of the inferior, and casts upon him the burden of showing affirmatively his compliance with all equitable requisites." It will be noted from this quotation that the Delaware Court has gone much further than this Court in holding that there is a presumption against the husband in all cases of transaction between husband and wife. That is not the law of this state, as we have already indicated, but if it were, it would give no basis for a presumption the other way; that is, against the wife. On the contrary, by the reason given it would negative effectively any presumption that a wife was ever the dominant party.

We conclude there is no presumption against the validity of the agreements in the case before us, and that the burden of proof was upon the appellant to show that the wife was the dominant party in the marriage, and that appellant was improperly influenced and coerced into making the agreement. That burden he has not sustained. He has not produced any evidence tending to show that he was dominated by his wife, or that she was the master mind in the marriage. He has shown no glaring inequality in the provisions agreed upon, such as would lead to that conclusion from the face of the papers. On the contrary, if he was relieved from the care of a large dwelling and from the support of his wife for what he could reasonably have thought would be many years, his agreement was not so one-sided. There was no concealment of assets and he was given an opportunity to get independent counsel to advise him. This he did not see fit to do. He has testified that he was willing to make the separation agreements, that after the first was made he preferred to abide by it, and not to go back to his wife, that when he did go back, he willingly entered into the second one. He

604

acquiesced in what was done, and he cannot now be heard to disclaim his bargain, although it may have unexpectedly resulted, by the early death of his wife, in being a worse one for him than he though it was at the time he made it. If he thought it was fair then, he cannot resort to the courts to correct his bad judgment or the effects of the laws of nature. The decree will be affirmed.

*Decree affirmed, with costs.*