# FLOYD EATON *v.* JOAN EATON

[No. 279, September Term, 1976.]

*Decided December 7, 1976.*

The cause was argued before THOMPSON, MENCHINE and LOWE, JJ.

*Charles A. Carlton,* with whom were *Lynch & Carlton* on the brief, for appellant.

*S. Allan Adelman,* with whom were *Lambert, Furlow, Elmore & Heidenberger* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

We affirm a decree of the Circuit Court for Montgomery County declaring a property agreement between a husband

158

and wife invalid for the reasons given by the trial judge, Plummer M. Shearin, in the following opinion:

"Upon the evidence adduced at hearing herein, the Court makes the following findings of fact:

"1. The parties hereto were married on April 29, 1963. At that time, plaintiff-wife was 28 years of age and the mother of two children, then 4 and 6-1/2 years of age, respectively. She had been married twice previously, the first marriage having been annulled and the second terminated by divorce. Although divorced for about 3 years prior to meeting and (within a month) marrying defendant, neither she nor the children received any support from their father because 'he never worked'.

"2. At the time of the marriage, defendant was 42 years of age, a widower for 2 years, the father of a 20-year-old son, the operator of an established refrigeration business (which he had purchased in 1952 for $15,500.) and owned real properties of substantial value.

"3. Less than a year after the marriage, defendant became concerned about the possibility of separation and divorce. He testified that the parties had frequent disputes, mainly about the children; that he was not allowed to correct them although they 'tore up his house'; that plaintiff 'kept taking the car and going out at night, leaving him to care for *her* children'; and that, to prevent this, he took some wires from the car, so it wouldn't run, and locked them in a bedroom. In retaliation, plaintiff used a hatchet to chop open the bedroom door.

"4. Defendant instructed his then attorney to prepare a 'Property Settlement Agreement', which was ultimately executed by the parties on April 24, 1964, a copy of which was received in evidence as Plaintiff's Exhibit No. 1. There was no *negotiation*

between the parties concerning the terms thereof. The completed draft was delivered to defendant and he presented it to plaintiff, telling her that she had the right to consult an attorney about it. She declined to do so and, about three days to a week later, signed it.

"5. Plaintiff testified that, at the time, the parties were having no serious marital difficulties; that she anticipated neither separation nor divorce; but that she knew defendant was displeased with her about something. While she didn't know what he was displeased about, in particular, she knew he was opposed to anything she wanted to do on her own, such as having a checking account, 'doing things around the house', et cetera. After she had purchased about $120.00 worth of clothing at Hecht's department store, on a charge card he had given her, he closed the account and denied her further charging privileges. Defendant made all decisions for her and the family and controlled the money, the checkbook 'and everything.' Plaintiff further testified that her primary concern at the time she signed the agreement was with preserving the marriage, not with money as such. While she was not 'forced' to sign it, she believed her husband when he told her the agreement was for her protection in the event they should later separate. Defendant confirmed that prior to signing the agreement, plaintiff told him she didn't want to separate but wanted to remain married. He testified that he told her he wanted the agreement so he wouldn't 'lose his property' and that she said, 'Go ahead; I don't want anything you've got.'

"6. The parties continued to live together as man and wife, occupying the same bedroom for approximately ten years after the agreement was signed. At the time of the hearing, they still lived under the same roof but for about a year she had slept in the living room and he in the bedroom.

"7. Within a few months after the execution of the agreement, disputes between the parties began to intensify and, about two years later, became serious. In about 1971, plaintiff first consulted a lawyer and then a marriage counsellor, who encouraged her to try to work out the marital problems. By 1974, she knew the marriage was deteriorating badly. The pending Bill of Complaint for Declaratory Judgment was filed on October 4 of that year.

"8. At the time the agreement was executed, plaintiff was not gainfully employed, owned no real property and no personal property of consequence nor did she have any prospect of inheritance from any source.

"9. At that time, defendant solely owned the refrigeration business mentioned above and an 85-acre farm in West Virginia. He testified that 57 acres of land in Boyds, Maryland, apparently improved by two dwellings, one occupied by his son and the other by the parties hereto, the business property at 8408 Ramsey Avenue, Silver Spring, and a rental property at 2308 Linden Lane, Silver Spring, are now owned by him and his son as joint tenants. How these properties were titled on April 24, 1964, is uncertain. His adjusted gross income for 1967, as shown by his Federal income tax return for that year, was $28,293.97, of which $26,460.00 was reported as salary paid him by Eaton's Refrigeration Service, Inc. Plaintiff estimated the 1964 value of defendant's properties at between $200,000. and $250,000., which he did not expressly deny. [The appellant's testimony, if accepted, would have shown a 1964 value of approximately $100,000. In our view this would not have changed the result.]

"10. The agreement in question provided, in substance, that plaintiff would keep all the property she had free of any claim by the defendant

and that, with the exception of certain jointly owned personalty described in paragraph 'SIXTH', plaintiff would give up all rights she might have by way of dower or joint ownership in defendant's property then owned or thereafter acquired. Each of the parties relinquished the right to inherit from the other and to administer the other's estate. Additionally, each relinquished 'any and all rights of whatsoever kind or nature originating in and growing out of the marriage status.' The plaintiff, under paragraph 'SIXTH', received the furniture in the parties' bedroom, the living room furniture and all kitchen utensils and dishes (but not the kitchen appliances). In addition, it was provided in paragraph 'TWELTH' (sic) that,

> 'The husband in addition to any other property given to the wife, shall *upon separation* pay to the wife the sum of One Thousand Dollars ($1,000.00) in full and final payment of all and any other claims, if any, which the said wife may have or believe she has, and the wife shall seek no further payment from the husband by way of support or alimony.' (Emphasis supplied.)

"Plaintiff testified without contradiction that the furniture which she was to receive cost approximately $3,000. in early 1964 and the kitchen utensils and dishes were worth approximately $300. at the time the agreement was signed.

"11. The Court finds plaintiff's testimony, that she did not read the agreement before she signed it and that she probably did not then know what 'alimony' was, to be well-nigh incredible. It is apparent, however, that despite eleven or more years of schooling she was (and is) of limited intelligence, lacked experience in business affairs, was wholly dependent upon defendant for the support of herself and children, was economically

and psychologically insecure, was largely submissive to the will and wishes of defendant, and viewed the agreement as a means of placating his 'displeasure'.

"There is no contest between the parties as to the propriety of declaratory relief in this matter.[1] In fact, defendant's answer prays that the Court find that the agreement between the parties is valid and binding upon them. Accordingly, the Court will determine the validity of the challenged agreement pursuant to Secs. 3-401 et seq., Courts and Judicial Proceedings Article, Maryland Code (Uniform Declaratory Judgments Act).

"By virtue of the common law and Section 28, Article 16, Md. Code, separation and property settlement agreements not disclosing on their face any injustice or inequity are presumptively valid and the burden to prove that their execution was caused by coercion, fraud or mistake is upon the party making the allegation. *Jackson v. Jackson*, 14 Md. App. 263, 269; *Cronin v. Hebditch*, 195 Md. 607, 618, citing *Owings v. Currier*, 186 Md. 590.

"In the instant case, as in *Cronin*, the agreement between a penniless wife and a comparatively wealthy husband (though not nearly as wealthy as Hebditch), shows on its face that it is without reasonable consideration and is unjust and inequitable. While there is no unlawful agreement here to obtain a divorce, as there was in *Cronin*, defendant in this case has ostensibly purchased far more cheaply than a Court of Equity can condone all of the plaintiff's rights 'of whatsoever kind or nature originating in and growing out of the marriage status.' This language could hardly be broader or more pervasive.

"Assuming, *arguendo*, that the agreement might

---

**1.** *See* Md. Code, Art. 45, § 20 (1957, 1971 Repl. Vol.); Blumenthal v. Monumental Security, 271 Md. 298, 302, 316 A. 2d 243 (1974); Hudson v. Hudson, 226 Md. 521, 525, 174 A. 2d 339 (1961).

be facially valid, plaintiff has shown by a fair preponderance of evidence that the marital relationship was such as to give defendant dominance over her, *Gurley v. Gurley*, 245 Md. 393, 398; *Manos v. Papachrist*, 199 Md. 257, 262, that the agreement is not only unfair but is a fraud upon her marital rights in the light of the surrounding circumstances. *Cronin v. Hebditch, supra.*

"The Court rejects defendant's claim of laches, asserted for the first time in argument, based on *Kenny v. Peregoy*, 196 Md. 630. That case is so clearly distinguishable on its facts as to be inapposite. The wife's delay in bringing this action has not been such as to deprive the husband of any of his rights. He is still alive, well and fully capable of defending the claims made against him."

Contrary to appellant's argument, there is ample evidence in the record to support the chancellor's findings of fact. Appellant's reliance on *Grossman v. Grossman*, 234 Md. 139, 198 A. 2d 260 (1964) and *Owings v. Currier, supra*, is misplaced. In neither of those cases was there a finding that a relatively wealthy husband dominated an impecunious wife and induced her to sign a property agreement without reasonable consideration.

*Decree affirmed.*
*Appellant to pay costs.*