## JUDITH ECKSTEIN *v.* DONALD ECKSTEIN

[No. 338, September Term, 1977.]

*Decided January 12, 1978.*

The cause was argued before MOYLAN, LISS and COUCH, JJ.

*John B. Low* for appellant.

*Thomas B. Yewell* for appellee.

LISS, J., delivered the opinion of the Court.

Judith Eckstein, appellant (hereinafter "wife"), and Donald Eckstein, appellee (hereinafter "husband"), were married in Maryland on May 25, 1968. The wife had one daughter from a previous marriage, Kimberly, who was adopted by the husband after their marriage; and a second daughter, Donna, was born to the Ecksteins. At the time of the separation between the parties the children were eight and six years old respectively. The wife had a history of mental disturbances, and in September of 1973, she sought professional help from a psychiatrist, Dr. Gultken Ovacik. During the course of her sessions with Dr. Ovacik, in January of 1974, the wife was committed to the Prince George's Hospital Psychiatric Ward for treatment, where she remained confined for a period of

46 days. Dr. Ovacik, who continued to see her at the hospital, testified that her last visit with him during that period was April 3, 1974, at which time she advised him that she was not going to see him again because her husband objected to her seeing a psychiatrist. She did not see him again until July 21, 1975. The doctor testified that he found the wife to be suffering from a reactive depression when he saw her in April of 1974 and that the condition had not changed when he saw her in July of 1975. Her history indicated that she had attempted suicide four or five times and that she was hospitalized on at least three occasions as a result of these attempts. Dr. Ovacik indicated that in his opinion she was suffering from the reactive depression well before he first saw her in September of 1973.

The marriage was hardly an idyll of matrimonial bliss, and the parties separated temporarily on a number of occasions. During one of these separations in 1971, the husband had his lawyer, a Mr. Lietch, prepare a separation and property settlement agreement; and on April 13, 1971, the husband took the wife — who had no counsel and was not given an opportunity to consult counsel — to his lawyer's office. The wife signed the agreement, and later that afternoon, she took an overdose of prescribed drugs and was hospitalized. The husband communicated with her by phone while she was in the hospital, and a reconciliation ensued. Several other separations had occurred between the parties and during one such period (in November of 1970), the wife employed an attorney who prepared a separation agreement more favorable to her than the one she ultimately signed but which her husband refused to sign.

On the evening of February 1, 1975, the wife left the marital abode in the parties' jointly owned 1973 Volkswagen van with only the clothes on her back. She had no funds and the husband promptly closed the couple's joint bank account. The wife consulted Legal Aid but was advised that she did not qualify for their assistance. Shortly after the wife left her husband, he discovered her whereabouts and the location of the van and with the assistance of the wife's stepfather seized and secreted the van. The husband refused the wife's request

to visit or communicate with her children and refused to give her her clothing. He told her that she could see her children and take her clothes only if she signed a separation agreement prepared by Mr. Leitch, his attorney. Subsequent events disclosed that the agreement was almost an exact duplicate of the one she signed in 1971 after which she attempted suicide.

On February 10, 1975, she was directed by her husband to go to Mr. Leitch's office; she had no money to employ counsel. At Mr. Leitch's office she was advised that her husband was in the suite but would not talk to her in person. A copy of the separation agreement was given to her to read. She asked several questions of Mr. Leitch who testified that he did not recollect what the questions were but that he refused to give her any advice because he was representing her husband. He asked her if she wanted to talk to her husband and put him on an inter-office phone to discuss the matter with her. The husband also admitted that the wife asked several questions about the agreement but stated that he could not remember what the inquiries were and he did not answer them. The wife testified that her husband told her that if she did not sign the agreement he would get her for desertion, that she would never see her children again, and that she would get nothing — neither her clothes nor the van — unless she signed the agreement as written. No changes were made in the document, and the wife signed the agreement in Mr. Leitch's office. Immediately after signing, her clothes were surrendered to her and she was given the keys to the Volkswagen van.

The separation agreement provided that the wife give custody of the children to her husband. She agreed to deed to her husband her interest in the jointly owned home of the parties.[1] She agreed to assign to her husband her interest in

---

1. At the time of the signing of the settlement agreement in February of 1975, there was no discussion as to the value of the equity of the property. Approximately one month later, the husband secured an appraisal of the property at $74,000. It was later offered for sale in early 1976 for $79,500. At the time of the execution of the agreement, there was a total indebtedness on the property of approximately $40,000, making the husband and wife's equity between $30,000 and $40,000.

a jointly owned new 1975 Chevrolet van; she received the Volkswagen. She waived alimony, support, maintenance, court costs, attorney's fees, and any right of inheritance in her husband's estate. She was to receive one-half of the income tax refunds due the parties, of which her share would be approximately $1,000. She was paid $1100 at the time of the execution of the agreement. The husband agreed to retain the wife on his health insurance policy until they were divorced. The wife was to receive any of their furniture which she desired.[2]

On February 10, 1976, the husband filed a bill of complaint in the Circuit Court for Prince George's County in which he prayed the court to grant him a divorce a vinculo matrimonii on the ground of voluntary separation and to require specific performance of the third and fourth paragraphs of the property settlement agreement executed by the parties on February 10, 1975. These paragraphs concerned the exchange of the titles to the two vans owned by the parties.

The wife filed an answer in which she prayed that the court grant the divorce but alleged lack of mental capacity on her part and coercion, duress, fraud, breach of contract, lack of consideration and gross over reaching on the part of the husband in securing the execution of the agreement, and requested that the court set aside the property settlement between the parties. She also sought custody of the minor children and counsel fees. The trial court, with the approval of both parties, treated the answer filed by the wife as a cross-bill of complaint seeking affirmative relief. At the conclusion of two days of testimony, the trial court granted the husband's prayer for a divorce a vinculo; granted him custody of the minor children, with visitation rights to the wife; and upheld the validity of the separation and property agreement. All the prayers for relief of the wife were denied, and her cross-bill of complaint was dismissed.

Appellant in this appeal has raised no issue as to the trial court's granting of the divorce a vinculo matrimonii or the

---

2. The wife contends that the furniture was her sole property from her previous marriage, with the exception of several pieces bought by her mother after her marriage to Eckstein.

awarding of custody of the minor children of the parties to the husband. The issues to be considered by us are:

1) Did the trial court err in refusing to set aside the separation agreement between the parties on the grounds of duress?; and

2) Was the refusal of the trial court to grant counsel fees to the wife's counsel reversible error?

Several corollary issues were raised by the appellant, but since we shall reverse on the first of these issues, it will not be necessary for us to consider them. The reversal is dispositive of the second issue, as the waiver of counsel fees is included in the agreement we hold to be invalid.

A separation agreement, being a contract between the parties, is subject to the same general rules governing other contracts. *Coffman v. Hayes,* 259 Md. 708, 270 A. 2d 808 (1970); *Heinmuller v. Heinmuller,* 257 Md. 672, 264 A. 2d 847 (1970); 1 Nelson, *Divorce and Annulment.* §§ 13.05, 13.32 (2d Ed., 1945).

In the recent case of *Bell v. Bell,* 38 Md. App. 10, 379 A. 2d 419 (1977) Judge Thompson of this Court discussed the present state of the law governing transactions between husband and wife: Maryland does not presume the existence of a confidential relationship in such transactions. *Owings v. Currier,* 186 Md. 590, 47 A. 2d 743 (1946). Since the adoption of Article 46 of the Maryland Declaration of Rights, i.e., the Equal Rights Amendment, we have abandoned the previous presumption that the husband was the dominant figure in a marriage. *Manos v. Papachrist,* 199 Md. 257, 86 A. 2d 474 (1951); *Trupp v. Wolff,* 24 Md. App. 588, n.15, 335 A. 2d 171 (1975); and the Court of Appeals has declared that sex classifications are no longer permissible under that amendment. *Rand v. Rand,* 280 Md. 508, 374 A. 2d 900 (1977).

The appellant in her brief raises the question of the existence of a confidential relationship between the husband and wife in this case, but the facts disclosed in the record indicate no basis for such a contention. In the absence of such a confidential relationship, separation agreements not disclosing any injustice or inequity on their face are

presumptively valid; and the burden is on the party challenging the agreement to show that its execution resulted from coercion, fraud, or mistake. *Cronin v. Hebditch,* 195 Md. 607, 74 A. 2d 50 (1950); *Owings v. Currier, supra; Jackson v. Jackson,* 14 Md. App. 263, 286 A. 2d 778 (1972).

Appellant contends that the separation agreement which she signed was on its face unjust and inequitable. Her principal complaint concerns the value of the jointly owned home which she conveyed to her husband for $1100. (See footnote (1)) The wife also alleged an interest in certain secret personal bank accounts held by the husband in his name in trust for himself and the children of the parties, but these accounts have no relevance in this case. In *Bell, supra,* we held that the relinquishment by a wife of her interest in jointly owned real estate worth $210,000 for approximately $45,000 in property and cash was not sufficient to make a settlement agreement between the husband and wife inequitable and unjust on its face. There, we distinguished the facts in *Bell* from *Eaton v. Eaton,* 34 Md. App. 157, 366 A. 2d 121 (1976), where we set aside an agreement in which the wife surrendered her interest in property worth a quarter million dollars for $4300. We cannot say that this agreement on its face is so inequitable and unjust that we are required to set it aside. The appellant, therefore, was left in the position that in order to prevail before the trial court, she had to assume the burden of proving that the agreement which she executed was not made in the exercise of her own free will — but was exacted from her by duress.

In order to establish duress, there must be a wrongful act which deprives an individual of the exercise of his free will. *Central Bank v. Copeland,* 18 Md. 305 (1862); *Restatement (Second) of Contracts,* §§ 316-318 (Tent. Draft No. 12, 1977); 13 *Williston on Contracts,* §§ 1606-1607 (3 ed. W. Jaeger ed. 1970). In *Central Bank, supra,* the Court stated the rule as follows:

> "The element of obligation upon which a contract may be enforced springs primarily from the unrestrained mutual assent of the contracting parties, and where the assent of one to a contract is constrained and involuntary, he will not be held

obligated or bound by it. A contract, the execution of which is induced by fraud, is void, and a stronger character cannot reasonably be assigned to one, the execution of which is obtained by duress. Artifice and force differ only as modes of obtaining the assent of a contracting party, and a contract to which one assents through imposition or overpowering intimidation, will be declared void, on an appeal to either a court of law or equity to enforce it. The question, whether one executes a contract or deed with a mind and will sufficiently free to make the act binding, is often difficult to determine, but for that purpose a court of equity, unrestrained by the more technical rules which govern courts of law in that respect, will consider all the circumstances from which rational inferences may be drawn, and will refuse its aid against one who, although apparently acting voluntarily, yet, in fact, appears to have executed a contract, with a mind so subdued by harshness, cruelty, extreme distress, or apprehensions short of legal duress, as to overpower and control the will." *Id.* at 317-18. (citations omitted).

The *Restatement (Second) of Contracts, supra,* § 318 (2), speaks of the circumstances under which a threat is improper and may amount to duress:

"A threat is improper if the resulting exchange is not on fair terms, and
    (a) the threatened act would harm the recipient and would not significantly benefit the party making the threat, or
    (b) the effectiveness of the threat in inducing the manifestation of assent is significantly increased by prior unfair dealing by the party making the threat, or
    (c) what is threatened is otherwise a use of power for illegitimate ends."

The comment in the *Restatement* on this section indicates that clause (b) is concerned with cases in which the party making the threat has by unfair dealing achieved an advantage over the recipient which makes the threat unusually effective. Typical examples involve manipulative conduct during the bargaining stage that leaves one person at the mercy of another. Clause (c) is concerned with other cases in which the threatened act involves the use of power for illegitimate ends. Illustration 15 postulates the following situation:

> "A operates a fur storage concession for customers of B's store. A becomes bankrupt and fails to pay C $1,000 for charges for storing furs of B's customers. C makes a threat to B not to deliver the furs to B's customers unless B makes a contract to pay C the $1,000 plus $2,000 that A owes C for storage of other furs. B, afraid of offending its customers and having no reasonable alternative, makes the contract. If the court concludes that C's threat to B is a use for illegitimate ends of its power as against B to retain the furs for the $1,000 owed for the storage of furs for B's customers, C's threat is improper and the contract is voidable by B."

13 *Williston on Contracts, supra,* § 1603, summarizes the manner in which duress may be exercised and gives as one of the methods "any ... wrongful acts that compel a person to manifest apparent assent to a transaction without his volition or cause such fear as to preclude him from exercising free will and judgment in entering into a transaction." *Id.* at 663. While the determination of duress is dependent upon the circumstances of each individual case, *Williston* states that the cases indicate that three elements are common to all situations where duress has been found to exist: "1) that one side involuntarily accepted the terms of another; 2) that circumstances permitted no other alternative; and 3) that the circumstances were the result of the coercive acts of the opposite party." *United States v. Bethlehem Steel Corp.,* 315 U. S. 289, 62 S. Ct. 581, 86 L. Ed. 855 (1942); *French v. Schoemaker,* 14 Wall. (U. S.) 314, 20 L. Ed. 852 (1872).

Any agreement, contract, or deed obtained by oppressing a person by threats regarding the safety or liberty of himself, or his property, or a member of his family so as to deprive him of the free exercise of his will and prevent the mutuality of assent required for a valid contract may be avoided on the ground of duress. *See Balling v. Finch,* 203 Cal. App. 2d 413, 21 Cal. Repts. 490 (1962); *Lewis v. Fahn,* 113 Cal. App. 2d 95, 247 P. 2d 831 (1952); Annot. 5 A.L.R. 823 (1919).

Nor must the acts or threats which constitute duress be unlawful in order to affect the validity of the agreement. *Fowler v. Mumford,* 48 Del. 282, 102 A. 2d 535 (1954) stated:

> "It is true that under the modern view, acts or threats cannot constitute duress unless they are wrongful; but an act may be wrongful though lawful. Acts that are wrongful in a  moral sense, though not criminal or tortious or in violation of contractual duty, may also constitute duress under the doctrine sought to be invoked by the defendant." 102 A. 2d at 538.

*See Restatement of Contracts,* § 492 (g).

In *Bell, supra,* Judge Thompson, quoting *Link v. Link,* 278 N.C. 181, 179 S.E.2d 697 (1971), pointed out the direction which the law of duress has taken in the more recent decisions:

> " 'The law with reference to duress has, however, undergone an evolution favorable to the victim of oppressive action or threats. The weight of modern authority supports the rule, which we here adopt, that the act done or threatened may be wrongful even though not unlawful, per se; and that the threat to institute legal proceedings, criminal or civil, which might be justifiable, per se, becomes wrongful, within the meaning of this rule, if made with the corrupt intent to coerce a transaction grossly unfair to the victim and not related to the subject of such proceedings.' 179 S.E.2d at 705." 38 Md. App. at 17, 379 A. 2d at 423.

It becomes our responsibility at this point to review the facts as established at the lengthy hearing before the trial court and to review the law of the case. We are, of course, aware of the strictures of Maryland Rule 1086, which cautions that the judgment of the lower court shall not be set aside on the evidence unless clearly erroneous. We are also bound by the oft enunciated principle that the credibility of witnesses is primarily for the trier of the facts, and the appellate courts of Maryland will only overrule the findings of fact of a trial judge when they are clearly erroneous. *McDowell v. State,* 231 Md. 205, 189 A. 2d 611 (1963); *Weaver v. State,* 226 Md. 431, 174 A. 2d 76 (1961); *Staley v. Staley,* 25 Md. App. 99, 335 A. 2d 114 (1975).

We believe, however, that the appellant did, in fact, meet her burden of establishing that the separation agreement executed by her was signed under such circumstances as to preclude a finding that her actions were the product of her own free will. We further find that the facts which established the duress exercised by the husband on the wife in this case are not only found in the testimony of the wife and her witnesses but are in many instances corroborated by the husband and his witnesses. It is, we think, particularly significant that Mr. Leitch, appellee's attorney, confirmed the appellant's story concerning the withholding of her property from her until after she signed the agreement. Significant also is the fact that the husband never denied the wife's statement as to his threat that she would be denied communication and visitation with her children and would not get her clothes and van unless she signed the agreement. *See Gonzalez v. Gonzalez,* 57 Cal. App. 3d 736, 129 Cal. Rptr. 566 (1976).

Initially, it is clear that the wife had a long history of depressive behavior which indicated mental and emotional instability. Whether or not the trial court chose to accept the opinion of her psychiatrist regarding her mental capacity at the time of the execution of the agreement (which, incidentally, it did not) is unimportant. What is obvious, however, is that the psychiatrist's undisputed testimony concerning her medical history and hospital confinements

was sufficient to establish that the wife had a severe mental and emotional problem both before and after the execution of the agreement.

The testimony discloses that the wife was entirely without funds and without counsel at the time of the signing of the agreement. *See, Demaggio v. Demaggio,* 317 So. 2d 848 (Fla. App., 1975). The husband had denied the wife access to the funds in their joint checking account and gave her no money from the date of the separation until the date of the execution of the agreement. The wife was unemployed. The record indicates that the wife attempted to get legal assistance from Legal Aid and the Public Defender's office but was denied assistance because she was found to be ineligible for their services. The record further indicates that when the wife left the husband she took only the clothes that she was wearing and that when she later called and asked her husband for the clothes, he refused to give them to her until she signed the agreement prepared by his lawyer. He also refused to give her the jointly owned Volkswagen van or to permit her to see the children or even to communicate with them until after she signed the agreement. When asked why he would not give her her clothes and the Volkswagen, his answer was, "Why should I?" He admitted that his frame of mind at that time was one of being "mad" and "hurt".

The circumstances surrounding the signing of the agreement were bizarre, to say the least: We have already described what occurred between the husband and wife prior to her going to the office of her husband's attorney. When she arrived at Mr. Leitch's office, the agreement was in the process of being typed; the deed transferring her interest in the home had already been prepared. The wife raised several questions concerning the agreement, but neither the attorney nor the husband would answer them. The latter both admitted in their testimony that she raised some such questions, but, neither could remember what they were. When she told her husband that she would not sign the agreement, which was identical with the one she repudiated in 1971, he repeated his threats that she would get nothing — neither her van, nor her

518

clothes, nor the right to see or communicate with her children. No changes at all were made in the agreement as prepared by Mr. Leitch.

It is significant, we believe, that when under the circumstances she capitulated and signed the agreement, Mr. Leitch immediately delivered to her, in cash, the $1100 she was to receive for her interest in the property, and her clothes and the van were surrendered to her. These facts indicate to us a strong determination by the husband and his lawyer to pressure the wife into then and there executing the agreement.

The trial judge said that he was not "convinced that the contract should be set aside because of any inequity, or any coercion or undue influence or because of a breach of any fiduciary relationship or marital relationship existing between the parties." He did not, however, state the facts which brought him to this conclusion. He refused to set aside the separation agreement. We believe this was error.

We conclude that it was irregular for the husband and his counsel to prepare a complicated legal document and deeds conveying to the husband her interest in jointly held property without at least offering her an opportunity to have her questions answered by her own legal advisor. It was, we believe, improper to submit the documents to her on a take it or leave it basis and to coerce her signature by withholding her property and threatening to prevent her from seeing or communicating with her children. We might well have reached that conclusion even if the evidence was clear that the wife was a competent, stable, knowledgeable woman; but when, as here, it is obvious that the husband and his lawyer were dealing with an emotionally and mentally unstable individual, we think that the conclusion that the execution of the agreement was obtained by duress is inescapable. With no funds, no lawyer, no clothes, no transportation, and no viable alternative, it is not surprising that the wife capitulated and signed the agreement. We cannot accept that action,

under all the circumstances, as one taken by her of her own free will.

> *That portion of decree incorporating the separation agreement between the parties vacated; all other portions of decree affirmed; case remanded for further proceedings. Costs to be paid by appellee.*